UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No. 10-22692-CIV-HUCK**

**MANUEL ANTONIO RODRIGUEZ,**

Petitioner,

vs.

**EDWIN G. BUSS,** Secretary,
Florida Department of Corrections[1],

Respondent.

_____\

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

**THIS CAUSE** comes before the Court upon Petitioner, Manuel Antonio Rodriguez's

("Petitioner") Amended Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition")

[D.E. 32], filed on January 13, 2011.  Petitioner is currently on death row at the Union Correctional

Institution in Raiford, Florida following convictions in 1993 on three counts of first degree murder.

On January 28, 2011, the State filed a Response to Petition for Writ of Habeas Corpus. [D.E. 34].

Petitioner filed a reply on February 4, 2011. [D.E. 36].  The Court has considered the written

submissions, the entire record of Petitioner's state court proceedings and is otherwise fully advised

in the premises.  For the reasons set forth below, the Petition for Writ of Habeas Corpus is **DENIED**.

_____

[1] During the course of these proceedings, Walter A. McNeil was replaced as the Secretary
of the Department of Corrections by Edwin G. Buss who is now the proper respondent in this
proceeding.  Buss should, therefore, "automatically" be substituted as a party under Federal Rule
of Civil Procedure 25(d)(1). The Clerk is directed to docket and change the designation of the
Respondent.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted in Miami-Dade County, Florida of the first-degree murders of Bea

Joseph, Sam Joseph, and Genevieve Abraham.  The Florida Supreme Court summarized the facts

of the murders and the evidence at trial as follows:

Manuel and Luis Rodriguez[2] were both charged with armed burglary and three counts of first-degree murder. In exchange for his testimony at Manuel's trial, Luis was allowed to plead guilty to second-degree murder, for which he received a life sentence. Although they both have the same last name, Manuel and Luis are not related by blood. At the time of the crimes, Manuel lived with Luis's sister, Maria Malakoff, who was also known as "Cookie."

Manuel Rodriguez was convicted based on the following facts presented at trial. In December 1984, Bea Joseph, Sam Joseph, and Genevieve Abraham were found murdered in a Miami apartment building. The Josephs lived in the apartment in which they were found, and Sam Joseph was the apartment complex landlord. Abraham was visiting the Josephs at the time of the crimes. When Abraham was found, her wedding band, diamond watch, and diamond earrings were missing. There was no sign of forced entry into the apartment, but the apartment was in disarray. Apparently, each victim died quickly from gunshot wounds to the head, which were inflicted from shots fired at close range.

Law enforcement officers were unable to obtain enough evidence to solve these crimes until 1993. However, Manuel Rodriguez was suspected of involvement in the crimes soon after they occurred because of several calls he made to the police. In July 1985, police were contacted by a "tipster," who identified himself as Antonio Chait. The informant told them that on the night of the murders, he was living in the apartment complex where the murders occurred and he saw two males, one of whom he knew, running from the area near the Josephs' apartment. The tip was found to be without merit, and police determined that the informant was actually Rodriguez. Again, in November 1985, Rodriguez contacted police, identifying himself as Antonio Traves. He told police that on the night of the murders, he saw a man named Geraldo leaving the Josephs' apartment. That story could not be confirmed. Police were suspicious of Rodriguez but received no further leads until 1992.

In 1992, Rafael Lopez, Luis Rodriguez's brother-in-law, contacted police, hoping to

_____

        [2] Throughout the Order, the Court will refer to Manuel Rodriguez as "Petitioner" whereas Luis Rodriguez and Isidoro Rodriguez will be referred to by their first and last name. Petitioner is not related to Luis Rodriguez or Isidoro Rodriguez.

get the reward that had been posted for information about the murders. Lopez told police that Luis had confided to him that Luis and Manuel Rodriguez committed the murders. He stated that Luis told him that he and Manuel went to the Josephs' apartment to rob them and that they killed two old ladies and an old man. Thereafter, police contacted Luis, who eventually gave a formal confession, in which he implicated both himself and Manuel. The next day Manuel was questioned and arrested. Manuel gave numerous conflicting accounts of his activities at the time of the murders. In all but his final statement to police, he denied any involvement in the murders. Finally, he admitted involvement but contended that the robbery and murders were committed by Luis and Luis's brother Isidoro, and that he had simply acted as a lookout.

Luis Rodriguez testified against Manuel Rodriguez at trial. His trial testimony was somewhat different from his original confession.FN1 At trial, Luis testified that in 1984 he was living in Orlando. He stated that Manuel called him and asked if he was interested in making money by assisting Manuel in committing a robbery. Manuel told Luis that Luis would be the lookout and that Manuel would do all of the work. Luis flew to Miami and met Manuel. They went to the Josephs' apartment; Manuel knocked on the door and told Sam Joseph that Malakoff and the children were being held hostage and that they would be released only if the Josephs gave him money. Manuel then forced himself into the apartment. Luis followed and shut the door.

> FN1. In his initial confession, Luis Rodriguez stated that he shot Abraham through a pillow; that he shot at two people; that he had ingested cocaine and marijuana before the homicides; and that Manuel Rodriguez shot the Josephs after he shot Abraham.

Once inside the apartment, Manuel, who had brought two pairs of rubber gloves with him, put on one pair and told Luis to wear the other pair and not to touch anything in the apartment without the gloves. Sam Joseph offered to get money from the bedroom, but Manuel instructed Luis to look there instead. Luis found a gun in the Josephs' bedroom, and Manuel became angry with Sam Joseph because he thought the offer to get money from the bedroom was actually a ruse to get the gun. Eventually, during the course of the crime, Manuel shot both Sam and Bea Joseph with a gun he had brought with him and then he ordered Luis to shoot Abraham with the gun Luis had found in the Josephs' bedroom. Because Luis was scared, he did as he was told and then he fled. He stated that he did not receive any of the proceeds from the crime and flew back to Orlando the next day.

Luis's brother, Isidoro, also testified at trial. He provided documentation that he was working in another city at the time of the crimes. He also stated that, soon after the murders, his mother contacted him to tell him that she had found coins and jewelry in a bag under her trailer and that Manuel and Malakoff had shown up looking for it. Isidoro stated that he was aware of the murders in the building and that he took the

3

bag back to Orlando, where he threw it into a field. Isidoro's mother also testified and confirmed Isidoro's story.

Malakoff testified that she and Manuel had two children, one of whom died in 1984. She stated that members of her family did not like her or Manuel. She also said that Manuel was not angry with Sam Joseph at the time of the murders and that she did not believe that Manuel was involved in the murders. The State impeached her testimony through her sworn statement to the police in 1993, in which she said that Manuel had been angry with Sam Joseph and on the day of the murders had called him a son-of-a-bitch. Additionally, in her pretrial statement, she said that Manuel told her he killed Sam Joseph when Joseph reached for a gun; that he had made sure that Luis killed Abraham; and that Manuel made sure they were all dead.

Manuel Rodriguez was convicted as charged.

*Rodriguez v. State*, 753 So.2d 29, 34-35 (Fla. 2000). The jury unanimously recommended the death penalty for each of the murders. The judge sentenced Petitioner to death for each murder, finding six aggravating circumstances: (1) the murder was committed while Petitioner was under a sentence of imprisonment; (2) he had previously been convicted of violent felonies; (3) the murder was committed during the felony of armed burglary; (4) the murder was committed to avoid arrest; (5) the murder was committed for pecuniary gain; and (6) the murder was cold, calculated and premeditated (CCP). The trial judge found no statutory mitigation, but found the following nonstatutory mitigation: "[Manuel] Rodriguez was and is mentally ill, he has a history of drug abuse and drug psychosis, and he is a good brother, loving father, and caring son." *Id.* at 282.

On direct appeal to the Florida Supreme Court, Petitioner raised the following nine issues: (1) his right to silence and his failure to testify were improperly commented on at trial; (2) the trial court erroneously refused to allow a peremptory challenge as to a Hispanic venireperson; (3) the trial judge erroneously allowed a State peremptory challenge; (4) the State was improperly permitted to present evidence of collateral criminal activity; (5) the State was improperly permitted to introduce

4

hearsay evidence in the penalty phase proceeding; (6) the trial court improperly limited Petitioner's

introduction of evidence in mitigation; (7) the trial court improperly considered felony murder and

pecuniary gain as aggravating circumstances; (8) the trial court erred in finding that the murder was

CCP; and (9) the trial court erred in finding that the murder was committed to avoid arrest. *See*

*Rodriguez v. State*, 753 So.2d 29, 36 (Fla. 2000).   The Florida Supreme Court affirmed the

convictions and sentences of death. As to the guilt phase, the court reviewed a statement made by

a detective during trial and an improper comment during closing argument-both which could have

been interpreted as comments on Petitioner's right to remain silent. Nevertheless, the court found

that the comments constituted harmless error beyond a reasonable doubt.   *Id*. at 36-39. As to the

penalty phase, the court held it was error to permit Detective Crawford to testify as to the statements

from Alejandro Lago but held the error was harmless.   *Id*. at 45.

On April 16, 1994, Petitioner filed an amended motion for postconviction relief raising

numerous claims:

> (1) his convictions are materially unreliable based on the cumulative effects of
> ineffective assistance of counsel, the State withholding exculpatory or impeaching
> evidence, and the existence of newly discovered evidence; (2) his trial counsel had
> a conflict of interest; (3) Rodriguez was denied effective representation of trial
> counsel; (4) Rodriguez was denied the right to a fair trial based on prejudicial pretrial
> publicity and failing to change the venue; (5) Rodriguez is innocent of first-degree
> murder; (6) Rodriguez was denied effective assistance of counsel and the State
> withheld material impeachment evidence during the penalty phase and sentencing;
> (7) Rodriguez was denied his rights under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct.
> 1087, 84 L.Ed.2d 53 (1985); (8) Rodriguez is innocent of the death penalty; (9)
> Rodriguez's right of confrontation was violated during the penalty and sentencing
> phases; (10) Rodriguez's constitutional rights were violated when he was absent from
> critical stages of the trial; (11) Rodriguez's convictions and sentences are
> unconstitutional under *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d
> 556 (2002); (12) Rodriguez was denied a fair trial and a fair, reliable, and
> individualized capital sentencing determination; (13) Rodriguez's death sentence is
> premised on fundamental error because the jury was provided with inadequate

> instructions concerning what constitutes certain aggravating circumstances; (14) Rodriguez is being denied his constitutional rights based on rules that prohibit his counsel from interviewing jurors; (15) Rodriguez was denied his constitutional right to a fair trial, his right to counsel, and his right to confront the witnesses because he was rendered incompetent due to medication and his mental condition; (16) the verdict of guilt and jury recommendation for death are unreliable because the trial court provided the jury with erroneous statements regarding the applicable standard by which to judge expert testimony; (17) Rodriguez's sentence of death is being exacted pursuant to a pattern and practice of discrimination on the basis of race; (18) Florida's capital sentencing statute is unconstitutional on its face and as applied; (19) execution by electrocution or lethal injection is cruel and unusual punishment; (20) Rodriguez is being denied his constitutional rights because access to certain records and files are being withheld in violation of chapter 119, Florida Statutes (2009); (21) Rodriguez is not competent to be executed; and (22) Rodriguez's trial was fraught with procedural and substantive errors that cannot be considered harmless when viewed as a whole.

*Id.* at 283, n.5. After a limited evidentiary hearing, the trial court denied the amended motion. On appeal of the denial of this motion, Petitioner raised six claims, with a significant number of sub-claims: (1) he is entitled to a new trial due to the deprivation of the effective assistance of counsel and the violation of his due process rights under *Giglio v. United* States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the lack of a full and fair postconviction hearing before a neutral tribunal served to deny Petitioner his constitutional right to due process; (3) Petitioner was denied his Sixth Amendment right to a fair and impartial jury and the effective assistance of counsel during voir dire; (4) Petitioner is entitled to a hearing in order to establish that his trial counsel operated under multiple conflicts of interest; (5) Petitioner was denied a reliable sentencing phase and is entitled to a hearing on each of his penalty phase claims; and (6) the lower court erred in summarily denying the remainder of Petitioner's claims. *Id.* at 283, n.7.

After oral argument, the Florida Supreme Court relinquished jurisdiction to the circuit court

for further evidentiary hearings on three of Petitioner's claims: (1) the State's failure to disclose two letters that Willy Sirvas wrote to the prosecutor before the trial, alleging that he knew Luis Rodriguez would lie; (2) the State's failure to disclose letters pertaining to potential impeachment of Alejandro Lago, a witness whose hearsay statements were heard by the jury in the penalty phase through Detective Crawford; and (3) various potential impeachment evidence relating to Isidoro Rodriguez. *Id.* at 283.   After a second evidentiary hearing, the Florida Supreme Court held a second oral argument to review all arguments raised on appeal in both the initial and subsequent brief.  *Id.* at 284.  Ultimately, the Florida Supreme Court affirmed the denial of Petitioner's Rule 3.850 motion. *Id.*

During the pendency of his appeal of the denial of his Rule 3.850 postconviction motion, Petitioner also filed a state petition for writ of habeas corpus.  *Id.* at 295.  Petitioner raised eight claims of ineffective assistance of appellate counsel and one claim of error by the Florida Supreme Court: (1) counsel was ineffective in failing to appeal rulings relating to limits on the presentation of family history of mental illness as mitigation; (2) counsel was ineffective in failing to appeal the trial court's improper consideration of Petitioner's mother's mental illness as mitigation; (3) counsel was ineffective in failing to appeal the denial of relief based on improper prosecutorial comments relating to mitigation; (4) counsel was ineffective in failing to appeal the denial of relief on prosecutorial argument regarding Petitioner's prior convictions; (5) counsel was ineffective in failing to appeal the denial of a motion to suppress Petitioner's statements; (6) counsel was ineffective in failing to appeal pervasive prosecutorial misconduct and comment; (7) counsel was ineffective in failing to appeal numerous rulings limiting cross-examination; (8) counsel was ineffective in failing to appeal the ruling allowing the State to bring witness Maria Malakoff to the stand solely to

7

impeach her with her prior inconsistent statement; and (9) the court conducted an improper harmless error analysis in the direct appeal. *See id.* The Florida Supreme Court denied the petition.

On January 13, 2011, Petitioner filed an amended Petition for Writ of Habeas Corpus by a Person in State Custody. [D.E. 32]. This is the operative petition. In total, Petitioner asserts nine claims for relief with multiple sub-claims. On January 28, 2011, the State filed its response. [D.E. 34]. On February 4, 2011, Petitioner filed his reply. The matter is now ripe.

## II.   STANDARD OF REVIEW

Petitioner has filed a petition for writ of habeas corpus challenging his state court conviction and sentence. "[A] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). The Court's review of Petitioner's petition is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA, as incorporated in the federal habeas corpus statute for persons in custody pursuant to a state court judgment, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d).

"The 'contrary to' and 'unreasonable application' clauses of §2254(d)(1) are separate bases for reviewing a state court's decisions." *Putman v. Head*, 268 F. 3d 1223, 1241 (11th Cir. 2001).

"A state court decision is 'contrary to' clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case.'" *Id.* The relevant Supreme Court case law for this analysis are the "holdings, as opposed to the dicta . . . of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

"A state court conducts an 'unreasonable application' of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case." *Putman*, 268 F. 3d at 1241. An unreasonable application may also occur where "a state court unreasonably extends, or unreasonably declines to extend a legal principle from Supreme Court case law to a new context." *Id.* The Supreme Court has stated with respect to the term "unreasonable" that:

> The term " 'unreasonable' " is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." At the same time, the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 663-64 (2004) (citation omitted).

9

### III.   TIMELINESS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed a one-year limitations period for the filing of an application for relief under § 2254.  Accordingly, 28 U.S.C. § 2244(d) provides:

(1)   A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of State court.  The limitation period shall run from the latest of -

    (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented form filing by such State action;

    (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)   The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In most cases, including the present case, the limitation period begins to run pursuant to §2244(d)(1)(A).  The United State Supreme Court has held that "[f]inality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003).  Likewise, the Eleventh Circuit has held "that direct review of a state judgment of conviction concludes on the date of the Supreme Court's denial of a petition for writ of certiorari."  *See*

10

*Washington v. United States*, 243 F.3d 1299, 1300–01 (11th Cir.2001) (per curiam). Under §
2244(d)(2), AEDPA's statutory tolling provision, the word "pending" covers the time between a
lower court's decision and the filing of a notice of appeal to a higher state court. *Carey v. Saffold*,
536 U.S. 214, 215 (2002). The State properly concedes that the Petition is timely. Therefore, the
Court analyzes Petitioner's claims below.

## IV.   EXHAUSTION AND PROCEDURAL BARS

In response to Petitioner's petition, the State argues that certain of his claims are unexhausted
and procedurally barred from federal review. To exhaust state remedies, a petitioner must fairly
present every issue raised in his federal petition to the *state's highest court*. *Castille v. Peoples*, 489
U.S. 346, 351 (1989)(emphasis added). "When a petitioner fails to properly raise his federal claims
in state court, he deprives the State of 'an opportunity to address those claims in the first instance'
and frustrates the State's ability to honor his constitutional rights." *Cone v. Bell*, 129 S.Ct. 1769,
1780 (2009)(internal citations omitted). Therefore, these types of claims are unexhausted and barred
from federal habeas review. *See id.*

Ordinarily, a federal habeas corpus petition which contains unexhausted claims is dismissed
pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982), allowing Petitioner to return to the state forum to
present his unexhausted claim or claims. However, such a result in this instance would be futile,
since the Petitioner's unexhausted claims are now incapable of exhaustion at the state level and
would be procedurally barred under Florida law. Petitioner has already pursued a direct appeal and
filed his Rule 3.851 motion in state court, with the denial of the motions affirmed on appeal.[3]

---

[3]In Florida, issues which could be but are not raised on direct appeal may not be the
subject of a subsequent Rule 3.850 motion for post-conviction relief. *Kennedy v. State*, 547
So.2d 912 (Fla. 1989). Further, even if the subject claim was amenable to challenge pursuant to a

Because there are no procedural avenues remaining available in Florida which would allow the Petitioner to return to the state forum and exhaust the subject claim, the claim is likewise procedurally defaulted from federal review.  *Collier v. Jones*, 910 F.2d 770, 773 (11th Cir. 1990)(where dismissal to allow exhaustion of unexhausted claims would be futile due to state procedural bar, claims are procedurally barred in federal court as well).

Claims that are unexhausted and procedurally defaulted in state court are not reviewable by the Court unless the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent," as contemplated in *Murray v. Carrier*, 477 U.S. 478 (1986).  *See House v. Bell*, 547 U.S. 518 (2006); *Dretke v. Haley*, 541 U.S. 386 (2004).  *See also United States v. Frady*, 456 U.S. 152, 168 (1982).  Since Petitioner has not established cause to excuse his default, it need not be determined whether he suffered actual prejudice.  *See Glover v. Cain*, 128 F.3d 900, 904 n.5 (5th Cir. 1997).

## V.    CUMULATIVE EFFECT

The Court must begin by addressing the argument asserted in Petitioner's Reply.  ([D.E. 36] at 2).  He argues that "the State relied on the old tactic of dissecting the claims presented in order to argue that Manuel Rodriguez is not entitled to relief."  He further urges the Court to "reject the piecemeal approach of evaluating the various errors that occurred during both the guilt and penalty

---

Rule 3.850 motion, it cannot now be raised in a later Rule 3.850 motion because, except under limited circumstances not present here, Florida law bars successive Rule 3.850 motions.  *See* Fla.R.Crim.P. 3.850(f).  *See also Moore v. State*, 820 So.2d 199, 205 (Fla. 2002)(holding that a second or successive motion for post-conviction relief can be denied on the ground that it is an abuse of process if there is no reason for failing to raise the issues in the previous motion).

phase of the trial." ([D.E. 36] at 2).  In doing so, Petitioner implies that "[t]he **individual** errors and

violations that occurred during the investigation, arrest, prosecution, and beyond may not be a cause

for great concern in and of themselves, but, when considered collectively, the inescapable conclusion

is that Manuel Rodriguez was denied a fair trial and due process of law." (*Id.* at 2)(emphasis in

original).  Petitioner cites no case in support of this proposition.  In his Petition, Petitioner makes

claims of *Brady*[4] and *Giglio* violations, ineffective assistance of trial and appellate counsel,

prosecutorial misconduct and trial error.  While the Court is unaware of any United States Supreme

Court precedent addressing the applicability of the cumulative error doctrine in this specific context,

there is perhaps some support for this assertion from the Eleventh Circuit Court of Appeals as to a

cumulative effect of errors claim regarding the entire trial, that it must be viewed as a whole to

determine if the defendant "received a fair trial as is [his] due under our Constitution." *Conklin v.

Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004).  While the Court considered Petitioner's individual

claims in an item by item review, it also considered the cumulative effect of the incidents claimed

and viewed the trial as a whole.  However, as many of the claims are denied as being refuted by the

record or entirely without merit and the remainder of the claims have not met the standards for

---

[4] The Court acknowledges the process required for a materiality determination under *Brady* is as follows:

> "[T]he analytical process of gauging materiality begins with determining the force and effect of each individual item of favorable evidence not disclosed to the defense." *Smith*, 572 F.3d at 1346; *see also Kyles*, 514 U.S. at 437 n. 10, 115 S.Ct. at 1567 n. 10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect ... separately."); *Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1310 (11th Cir.2005) ("[T]he only way to evaluate the cumulative effect is to first examine each piece standing alone.").

*Hammond v. Hall*, 586 F.3d 1289, 1313 (11th Cir. 2009).

habeas relief, the Court does not find that Petitioner's trial, as a whole, was fundamentally unfair and outside the bounds of the Constitution.[5]  *See Conklin*, 366 F.3d at 1210.

## VI.   ANALYSIS

To begin, Petitioner implies that somehow §2254(d) does not operate as a standard of deference to which the Court must apply to the opinions of the state courts.  (*See* [D.E. 32] at 21). This is incorrect.  In *Harrington v. Richter*, 131 S.Ct 770 (2011), the United States Supreme Court again articulated the well known standard of deference that federal habeas courts must apply to the determinations of state courts in a federal habeas proceeding.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification* that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 786-87 (emphasis added).  To be clear, this is the standard of deference the Court must give to the opinions of the Florida Supreme Court.

Unfortunately, Petitioner, not taking into account the applicable standard of deference, failed

---

[5] Arguably, and as will been seen below, the only claim which the Court found had any true merit but was ultimately denied for failing to meet the prejudice requirement was Petitioner's *Brady* claim involving Luis Rodriguez and undisclosed letters from his cell mate, Willy Sirvas.  *See* Order at 30-31.

14

almost entirely to brief his claims under the correct legal standard.  For the majority of his claims, Petitioner failed to articulate why the Florida Supreme Court's decision was an unreasonable determination of the facts or an unreasonable application of clearly established federal law.  Indeed, Petitioner rarely cites to the opinions of the Florida Supreme Court. Moreover, Petitioner generally fails to articulate his claims in a manner such that the Court can easily discern exactly what claims he is asserting and the legal basis for them.  It appears that his claims are entirely subject-based and interwoven with allegations of trial court error, or perhaps, ineffective assistance of counsel (trial and appellate), or perhaps, prosecutorial misconduct, or perhaps, all of the above. It is difficult to follow his legal analysis.  Petitioner's claims are all based on the same set of facts but without a clear legal argument.  The result is that clear and concise claims are not always made.  As a result, this necessitated a four hundred ninety-five (495) page Response because the State was forced to respond to each "potential" claim in the alternative as it was often unclear as to exactly what Constitutional claim Petitioner was asserting.  Nonetheless, the Court has carefully dissected and analyzed the claims as made by Petitioner and finds as follows:

***I. Was petitioner deprived of his right to the effective assistance of counsel at trial and on appeal when his unreliable statements were admitted at the guilt phase of his trial and used to uphold the convictions as well as the death sentences.***

In his first claim for relief*,* Petitioner appears to argue that the trial court erred in denying a motion to suppress certain involuntary statements, that his appellate counsel was ineffective for failing to raise this issue on direct appeal, and that his trial counsel was ineffective at the hearing on the motion to suppress these statements. (*See* [D.E. 32] at 31-38).  These three sub-claims all stem from the same set of facts.

On August 4, 1993, Miami-Dade police detectives met with Manuel Rodriguez while he was

incarcerated at the Tomaka Correctional Institute on unrelated charges.  The officers did not read him his *Miranda* rights and questioned him for an hour.  On August 13, 1993, Miami-Dade police executed an arrest warrant for the murders implicated here and took Petitioner into custody.  He was transported from Starke, Florida to Metro-Dade Police Headquarters.  Petitioner was not questioned by officers during the transport.  Nonetheless, he made an inculpatory statement to the officers during the ride.  Upon arrival at the Metro-Dade Police headquarters, Petitioner was read his rights and was then questioned.  He made certain inculpatory statements. In advance of trial, his defense counsel filed a motion to suppress those statements.  Petitioner argued that due to his mental state and medications he was taking, his statements were not voluntarily given.  The trial court granted the motion, in part, and denied, in part. The trial court suppressed the statements made at Tomaka because Petitioner was not read his *Miranda* rights.  However, the trial court did not suppress the statements made during the ride to and at Metro-Dade Police Headquarters because the trial court found that those statements were either volunteered or were, post *Miranda* warning, freely given without coercion.  The trial court rejected the argument that Petitioner was not alert and may have be impaired.  (*See* [D.E. 16-14] at 62-63).  Petitioner raised this claim with the Florida Supreme Court as an ineffective assistance of counsel claim of both trial and appellate counsel.  The Florida Supreme Court rejected these arguments.

### *A. Trial Court Error*

Petitioner's appellate counsel did not raise this issue on direct appeal.  Therefore, as far as this sub-claim is intended to argue trial court error, it is unexhausted and procedurally barred from federal habeas review.  "When a petitioner fails to properly raise his federal claims in state court, he deprives the State of "an opportunity to address those claims in the first instance" and frustrates the

State's ability to honor his constitutional rights." *Cone v. Bell*, 129 S.Ct. 1769, 1780 (2009)(internal citations omitted).  Here, because it was not until his Rule 3.850 postconviction motion and petition for writ of habeas corpus in state court that Petitioner raised this claim, the Court does not consider any freestanding claim of trial error on the merits.[6]  However, even if the Court were to entertain this unexhausted claim, it would be denied for the reasons stated below.

### B. Ineffective Assistance of Appellate Counsel

Petitioner asserts that his appellate counsel was ineffective for failing to argue this claim on direct appeal of his conviction and sentence.  Petitioner first argued this claim in his state petition for writ of habeas corpus.  ([D.E. 16-8] at 19).  The Florida Supreme Court rejected this claim (and his seven other ineffective assistance of appellate counsel claims) by simply stating "the underlying claims of error would have been rejected on direct appeal, and therefore Rodriguez cannot establish either deficiency or prejudice."  *Rodriguez v. State,* 39 So.3d 275, 295 (2010).  While the Court would have preferred to have a detailed analysis on the resolution of this claim, it is not required for the Court to appropriately apply AEDPA deference.  "[A] state court's summary rejection of a claim qualifies as an adjudication on the merits ... so as to warrant deference." *Ferguson v. Culliver*, 527

---

[6] The Court recognizes that inherent in ineffective assistance of appellate counsel claims is a review of the merits of the underlying issue in order to determine if counsel's performance was deficient because counsel cannot be ineffective for failing to appeal a non-meritorious argument.  *See Cave v. Singletary*, 84 F.3d 1350 (11th Cir. 1996).  However, Petitioner erroneously argues that his substantive trial court error claims are not procedurally barred here because "Manuel Rodriguez presented his claims in extensive detail to the circuit court and to the Florida Supreme Court in such a way that a reasonable reader would understand the basis for the claims." ([D.E. 36] at 9). This is incorrect. Petitioner should have made those claims to the Florida Supreme Court on direct appeal.  *See Bruno v. State*, 807 So.2d 55 (Fla. 2001).  He did not.  Accordingly, those substantive claims are unexhausted and procedurally barred.  However, the Court reviews the substance of this claim for its analysis of the claim of ineffective assistance of appellate counsel only. *Spencer v. Sec'y, Dept. of Corr.,* 609 F.3d 1170 (11th Cir. 2010).

F.3d 1144, 1146 (11th Cir. 2008).

The United States Supreme Court set forth the two-prong test that a convicted defendant must meet to demonstrate that counsel rendered ineffective assistance. *Strickland v. Washington*, 466 U.S. 668 (1984). First, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is whether some reasonable attorney could have acted in the circumstances . . . [as this attorney did]-whether what . . . [this attorney] did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689) (citation omitted).

Second, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Court defines a "reasonable probability" as one "sufficient to undermine confidence in the outcome." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

The Florida Supreme Court found that to prevail on a claim of ineffective assistance of appellate counsel, Petitioner must first "establish that his appellate counsel's performance was deficient because of errors that are of such magnitude and are so serious that they fall outside the range of professionally acceptable performance. *Rodriguez*, 39 So.2d at 295. Second, Rodriguez must establish that he was prejudiced because of the deficiency. In determining if prejudice is shown, it must appear that appellate counsel's deficient performance 'compromised the appellate

18

process to such a degree as to undermine confidence in the correctness of the result.'" *Id.* (internal citations omitted).  The Florida Supreme Court then found that Petitioner's appellate counsel was not ineffective because the claim would have been denied on direct appeal,  that Petitioner's counsel's performance was not deficient and that Petitioner was not prejudiced.  The Court agrees.

> Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*. *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir.1991). In assessing an appellate attorney's performance, we are mindful that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue." *Id.* at 1130-31. Rather, an effective attorney will weed out weaker arguments, even though they may have merit. *See id.* at 1131. In order to establish prejudice, we must first review the merits of the omitted claim. *See id.* at 1132. Counsel's performance will be deemed prejudicial if we find that "the neglected claim would have a reasonable probability of success on appeal." *Id.*

*Philmore v. McNeil*, 575 F.3d 1251, 1264-65 (11th Cir 2009).  Here, Petitioner argues that his confession was not voluntarily given because law enforcement officials unduly pressured him and because of his diminished mental capacity.  Essentially, Petitioner argues he lacked the will to resist that pressure. (*See* [D.E. 32] at 34).  Petitioner does not cite to specific examples of exactly how the police created pressure or what specific tactics they employed to do so. Rather he reverts to a default argument that "custodial interrogations are **inherently** coercive."  ([D.E. 32] at 34)(emphasis in original).  Likewise, Petitioner fails to establish the specifics of his mental capacity other than to say that he "was undergoing psychiatric treatment and under the influence of psychotropic medication at the time of the interrogation."  (*Id.*)  Petitioner fails to indicate how or why this rendered him unable to resist the alleged pressure to make a statement.  More importantly, Petitioner fails to argue why the Florida Supreme Court's decision resulted in a decision that was contrary to, or involved

19

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or was a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Petitioner also argues that the trial court erred because the "combination of the inherently coercive techniques employed by the detectives during the interrogation with his mental incapacity" and because Petitioner "had already given an involuntary statement, rendered Manuel Rodriguez's statement involuntary under the 'totality of the circumstances.'" ([D.E. 32] at 35). Therefore, his appellate counsel was ineffective for not arguing this error on direct appeal. In support of his argument, Petitioner cites *Brown v. Illinois*, 422 U.S. 590 (1975); *Oregon v. Elstad*, 470 U.S. 298 (1985); *see also Missouri v. Seibert*, 542 U.S. 600 (2004). All three of those cases are factually distinguishable from Petitioner.[7] The trial court suppressed the statements made at Tomoka but found his later statements admissible. This decision comports with the cases cited by Petitioner. In *Brown,* (and similarly in *Seibert*), the facts were such that "there was no intervening event of significance whatsoever" between the statement obtained illegally and the second statement made after *Miranda* warnings were given. *Brown*, 422 U.S. at 604. Unlike *Brown*, Petitioner was initially interrogated on August 4, 1993. It was not until August 13, 1993, that police officers again interrogated Petitioner at an entirely different location. This does not compromise the voluntariness of his statements. "When a prior statement is actually coerced, the time that passes between

---

[7] It is not clear why Petitioner cites these cases in support of his claim since *Elstad* holds "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318.

20

confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Elstad*, 470 U.S. 298, 310 (1985).

The Court has reviewed the testimony and evidence offered at the suppression hearing and finds that it "amply supports the trial court's finding that the confessions were voluntary." *See Grayson v. Thompson*, 257 F.3d 1194, 1230 (11th Cir. 2001). The detective testified that while he was aware that Petitioner had taken certain medication that Petitioner did not seem impaired and advised law enforcement only that the medication made his mouth dry and could cause him to be nervous and restless. ([D.E. 16-13] at 63,67). After Petitioner was informed of his right to remain silent, he executed a *Miranda* waiver form. (*Id.*).

As the claim lacks merit, appellate counsel cannot be deficient for failing to make it. *See Philmore*, 575 F.3d at 1251. The Florida Supreme Court's determination was not contrary to, or an unreasonable application, of clearly established federal law. Nor was the ruling based on an unreasonable determination of the facts. Habeas relief is denied.

### C. Ineffective Assistance of Trial Counsel

Petitioner argues that his trial counsel was ineffective because while they "challenged the admission of the statements, they did not do so in a way that would protect their client's rights." ([D.E. 32] at 38). In particular, Petitioner contends that his counsel should have retained an expert to explain Petitioner's long mental history to the trial court. (*Id.* at 37). Petitioner first argued this claim in his appeal from the denial of his Rule 3.850 motion. ([D.E. 16-5] at 48). The Florida Supreme Court summarily denied this claim because it was either "refuted by the record" or 'without merit." *Rodriguez*, 39 So.2d at 284, n.8.

21

In order to prevail on this claim, Petitioner must show deficiency and prejudice.  Petitioner has shown neither.  Petitioner's claim is based entirely upon speculation.  He asserts that an expert "might have assisted counsel."  ([D.E. 32] at 37).  This type of speculation is not the basis for a successful ineffective assistance of counsel claim.  Petitioner fails to proffer what an expert would have said, if one had been retained.  Given the testimony of the police officer that Petitioner had no difficulty speaking or understanding the conversation with police officers; that he did not look or act strangely or reacted badly to any medication and that Petitioner's simply commented that his medication made his mouth dry and him restless, it is not unreasonable for his counsel to have not retained an expert to provide what could have been speculative testimony as to Petitioner's mental status at the time he made the statement. Petitioner has not shown that his counsel's performance was deficient. Given the record here, he would be unable to do so.  The Florida Supreme Court's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Thus, this claim is rejected.

***II.  Whether Petitioner was deprived of his right to a fair and impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution due to the ineffective assistance of counsel, misconduct of the prosecutor, and improper rulings by the trial court.***

*A. Batson Challenge*

Petitioner alleges that the trial court erred in allowing the State to exercise a peremptory challenge against an African American juror, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (*See* [D.E. 32] at 43).  The facts of this claim as characterized by the Florida Supreme Court were that, during jury selection, the State sought to challenge a venireperson for cause based on the State's perception that the venireperson could not return a guilty verdict if the verdict was based on the

testimony of a codefendant.  Petitioner objected to the challenge, noting that nothing in the venireperson's answers indicated that she could not return a guilty verdict based on a codefendant's testimony. The venireperson was recalled, and, after further questioning, the court denied the challenge for cause. The State then peremptorily challenged the venireperson.  Petitioner objected based on the fact that the venireperson was an African-American female. The State justified the challenge by explaining that the venireperson did not seem to understand the questions asked. Petitioner disagreed, stating that the venireperson had merely answered the questions in a quiet voice. The court allowed the challenge, finding that the venireperson seemed to have difficulty understanding the questions asked of her and in being understood by the court. *See Rodriguez*, 753 at 40-41.

Petitioner first argued that this finding was error on his direct appeal.  ([D.E. 16-1] at 75). The Florida Supreme Court denied this claim finding that "the trial court's decision on a peremptory challenge turns primarily on an assessment of credibility and will be affirmed on appeal unless it is clearly erroneous. *Melbourne*, 679 So.2d at 764. We cannot, on a cold record, second-guess whether the venireperson was difficult to understand or followed and understood the court's questions. This is exactly the type of credibility assessment that must be made by the trial court and, on this record, we cannot say that the trial court's decision was clearly erroneous."  *Rodriguez*, 753 So.2d at 41. Neither can this Court.

The *Batson* issue before the Court turns largely on an "evaluation of credibility." *Batson v. Kentucky*, 476 U.S. at 98, n. 21.  The trial court's determination is entitled to "great deference," *ibid.*, and "must be sustained unless it is clearly erroneous," *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).  That is the standard on direct review.  However, on federal habeas review, AEDPA

"imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (internal quotation marks omitted).  Here, the trial court credited the prosecutor's race-neutral explanations based on her own assessment of the venireperson's conduct, and the Florida Supreme Court reviewed the record at length when upholding the trial court's findings. The Florida Supreme Court's decision was plainly not unreasonable.  *See Felkner v. Jackson*, 2011 WL 940865 (March 21, 2011)(per curiam)("The trial court's determination is entitled to 'great deference'" and 'must be sustained unless it is clearly erroneous.'").   This claim is without merit.

### B. Ineffective Assistance of Trial Counsel

Petitioner argues that his trial counsel was ineffective for failing to move for a change of venue and for failing to adequately question and have removed a biased juror.  (*See* [D.E. 32] at 44-45).

### i. change of venue

Petitioner asserts that his trial counsel was ineffective for failing to move for a change of venue.  (*See* [D.E. 32] at 44).  Petitioner first argued this claim on appeal of the denial of his Rule 3.850 motion for postconviction relief.  ([D.E. 16-5] at 80).  The Florida Supreme Court summarily denied this claim because it was either "refuted by the record" or "without merit."  *Rodriguez*, 39 So.2d at 284, n.8.  The Court agrees.

In support of this claim, Petitioner has offered no compelling argument.  He simply states "[t]his was a highly publicized case, as the victim Genevieve Abraham and her husband, Anthony Abraham, were prominent members of the Miami-Dade community."  ([D.E. 32] at 44).  This is not enough.  "To hold that the mere existence of any preconceived notion as to the guilt or innocence

of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717 (1961). Petitioner offers not one citation to the record in support of his contention that "[t]here is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue." (*Id.* at 44). Petitioner has "not even come close to the sort of evidentiary showing necessary to establish that his defense was prejudiced by [trial counsel's] failure to file" a change of venue motion. *See Chandler v. McDonough*, 471 F.3d 1360 (11th Cir. 2006). This claim is without merit.

### ii. biased juror

Petitioner alleges that his trial counsel was ineffective for failing to adequately question and seek the removal of a biased juror. (*See* [D.E. 32] at 45). Petitioner argues that one of the jurors on the panel was biased because his father worked for Anthony Abraham Chevrolet (the owner of Anthony Abraham Chevrolet is the victim, Genevieve Abraham's husband) for over twenty-five years. The juror had also worked for Mr. Abraham and had once met him. (*Id.*). When questioned by the court, if the fact that he and his father worked for Mr. Abraham would "influence you in any way in this case," Juror Kennedy stated "No." ([D.E. 16-46] at 74). The court asked again if Juror Kennedy was sure he would not be influenced in this case, to which he responded "I'm sure." (*Id.*) Despite this, Petitioner argues that this juror was biased and his counsel was ineffective for failing to adequately question and seek removal of this juror from the panel. In support of this argument, Petitioner quotes a later response that Juror Kennedy made to a defense counsel's inquiry.

I was young at the time. I didn't have any association with him. My father was the

main person dealing with Mr. Abraham. As far as – what can I say, I have a lot of feelings. I don't know what to say.

([D.E. 32] at 45).

In his petition, Petitioner categorizes this as a response to defense counsel's inquiry about whether or not Juror Kennedy could be fair, when in truth this response was made after being asked, "How do you feel about sitting in a case where you have to decide - - where his wife was brutally murder [sic]?" ([D.E. 16-46] at 76).  This does not indicate that he could not be a fair and impartial juror. As this is the only statement that Petitioner argues is evidence that Juror Kennedy had a perceived bias and inability to be impartial, his counsel was not ineffective for failing to "adequately question" him during voir dire.

Petitioner first raised this argument on appeal after the denial of his Rule 3.850 postconviction motion. ([D.E. 16-5] at 73). The Florida Supreme Court summarily denied this claim because it was either "refuted by the record" or "without merit."  *Rodriguez*, 39 So.2d at 284, n.8. The Court agrees.  In response to questioning by the court, the State and the defense,  Juror Kennedy was unequivocal about his ability to be a fair and impartial juror.  The Court cannot say that counsel for Petitioner was ineffective for failing to ask additional questions of this juror.

"In this case, the factual record is sufficient for this Court to conclude the state court's adjudication was not 'contrary to' or 'an unreasonable application of' clearly established federal law or 'based on an unreasonable determination of the facts.'"  *Carroll v. Sec'y, Dep't. of Corr.*, 574 F.3d 1354, 1365 (11th Cir. 2009).  Habeas relief on this ground must be denied.


***III. Whether Petitioner was deprived of due process and the right to a fair trial rendering the convictions materially unreliable in violation of his constitutional rights as guaranteed by the***

*Fifth, Sixth, Eighth, and Fourteenth Amendments.*

In his third claim for relief, Petitioner contends that the State is guilty of multiple *Brady* violations. ([D.E. 32] at 53-78).

### A. Brady v. Maryland, 373 U.S. 83 (1963).

Petitioner argues that the State failed to disclose the consideration given to the co-defendant, Luis Rodriguez by the police and failed to notify the defense of certain threats that were made by police to coerce Luis Rodriguez to testify.  (*See* [D.E. 32] at 53). Petitioner also contends that the State was in possession of certain letters that were sent from an inmate at the local jail to the Assistant State Attorney which could have affected Luis Rodriguez's credibility. ([D.E. 32] at 59). Additionally, Petitioner contends that the State withheld information regarding witness, Isidoro Rodriguez's Seminole County narcotics complaint and possible involvement in a 1979 drug related murder.  ([D.E. 32] at 66-72).  Further, Petitioner argues that Isidoro Rodriguez was pressured to testify by the police and that Isidoro Rodriguez had an undisclosed relative on the police force. ([D.E. 32] at 76).  Petitioner first made these claims on appeal of the denial of his Rule 3.850 postconviction motion.  ([D.E. 16-5] at 15-48).  The trial court held evidentiary hearings on the claims.  For the sake of clarity, the Court will analyze the sub-claims regarding Luis Rodriguez and Isidoro Rodriguez separately.

### i. Luis Rodriguez

Luis Rodriguez was the co-defendant in the triple homicide for which Petitioner was convicted. Luis Rodriguez was the central witness against Petitioner and Petitioner's defense was that while he was involved, Luis Rodriguez was the main actor involved in this crime. His testimony was crucial to the State's case.  Petitioner argues that the State withheld certain information which

27

would have either called into question Luis Rodriguez's testimony or could have been used to impeach him.  The withheld information falls into two categories. First, the failure to disclose letters sent to the prosecutor by a fellow inmate.  Second, potential impeachment regarding threats and favorable treatment.

### a. Failure to Disclose Letters

Petitioner made this claim in his postconviction Rule 3.850 motion.  The trial court held an evidentiary hearing wherein witnesses testified regarding these letters.  On appeal of the denial of this claim, the Florida Supreme Court affirmed as follows:

> We first address Rodriguez's allegations of a *Brady* violation when the State failed to disclose two letters that jail inmate Willy Sirvas wrote to the prosecutor, prior to trial, alleging that Luis Rodriguez would lie. The first letter, dated August 10, 1995, stated as follows:
>
> Dear Laeser-Hague:
>
> I'm in the same dormitory as inmate Luis Rodriguez # 93-65604. You have to ask for continuance on August 14. Rodriguez told me everything about the murders and he said that the state can't pruebe [sic] him anything without a witness or pruebes [sic] that lead him to this murders. I will get in touch.
>
> The May 28, 1996, letter states:
>
> Dear Mr. Abe Laeser and Andrew Hague:
>
> A year ago I wrote a letter to the state attorney office. And my letter ignore. [sic] Now, Mr. Richard Houlihan could use my testimony in court in reference to Luis Rodriguez lies to save his ass, is only one true. [sic]
>
> For there to be a violation of *Brady*, the state must have suppressed evidence that was exculpatory and the Defendant must have suffered some prejudice as a result.
>
> * * *

28

The 1995 letter was not signed it was unknown by the prosecution from whom it was sent. It would not have been helpful to defense counsel. Arguably, the 1996 letter should have been turned over. However, Defendant was not prejudiced as a result of the failure to turn over the 1996 letter. Counsel for Defendant testified at the hearing that they did not think that Luis was telling the truth. Luis was extensively cross-examined. Even if Sirvas was called to testify at trial, his oral testimony contradicted what he wrote in the letter. He did not have any credibility in front of a jury.

* * *

Although we disagree with the court's conclusions regarding whether this was favorable evidence that was not timely disclosed, we ultimately agree that Rodriguez has not shown prejudice.

We agree with Rodriguez that both letters should have been disclosed and *strongly condemn such conduct*.

* * *

While the record clearly establishes that the State wrongfully withheld favorable evidence, in order to be entitled to relief, Rodriguez must also demonstrate prejudice, which he has not done. Sirvas admitted at the evidentiary hearing that Luis did not tell him any of the specifics about the case itself and that he did not even know the codefendant's name. This testimony was directly contrary to some of the statements in his 1995 letter in which Sirvas alleged that Luis had told him "everything." Because his actual testimony contradicted his letters, Sirvas's credibility is questionable.

More importantly, Sirvas's testimony at the evidentiary hearing shows that Sirvas did not know the underlying facts of the case and who participated in the crime. Thus, Rodriguez would have been unable to show how Luis lied about Rodriguez's involvement. When Sirvas was questioned during the evidentiary hearing, he was asked directly about why he stated in his letter that he believed Luis would lie. Sirvas responded, "You know, he was lying because, you know, he was testifying, the defendant because I don't even know his name or who he was. But he told me that the State is helping me, you know, how do you call it? A charge, you know, if I testify against my codefendant. That's why he was lying, you know." At no point did Sirvas provide any testimony that sufficiently explained why Sirvas thought that Luis would lie. Both his letter and his testimony assumed that because Luis decided to plead guilty to a lesser charge in order to avoid the death penalty, Luis would lie. The jury was aware that Luis had entered a plea in order to avoid the death penalty. Accordingly, the defense cannot show how Rodriguez was prejudiced by the failure

to turn over the letters.

*Rodriguez*, 39 So.2d at 285-88 (emphasis in original)(internal citations and quotations omitted).  The Court has reviewed the transcript from the evidentiary hearing and agrees with the Florida Supreme Court.   The delayed disclosure of *Brady* evidence compels reversal only when the defendant demonstrates prejudice.  A *Brady* violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (quotation marks omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The delayed disclosure of *Brady* evidence compels reversal only when the defendant demonstrates prejudice. *United States v. Beale*, 921 F.2d 1412, 1426 (11th Cir.1991).  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense." *United States v. Agurs*, 427 U.S. 97 (1976).

Here, the Florida Supreme Court properly applied clearly established federal law to the facts of this case.  While the Court agrees that these letters should have but were not disclosed to the defense, Petitioner has not met the prejudice prong.  At trial, Petitioner's defense attorney vigorously cross-examined Luis Rodriguez.  The defense attorney vigorously challenged Luis' credibility and truthfulness based on his plea agreement with the State.  Despite Luis' obvious ulterior motive, the jury presumably found Luis Rodriguez, at least somewhat, credible.  It is unlikely that the letters

from Mr. Silvas or his possible testimony at trial regarding Luis Rodriguez's intent to lie to spare himself from the death penalty would have created a reasonable probability that they would have favorably affected the outcome of the case.  Accordingly, this claim is rejected.

### b. Potential Impeachment Regarding Threats and Favorable Treatment

In this claim, Petitioner argues that the State violated *Brady* and *Giglio* when it failed to disclose certain information which may have been impeachment evidence against Luis Rodriguez. Petitioner argued the identical claim in is Rule 3.850 postconviction motion.[8]  It was denied. Petitioner argues three specific violations:

> In his next subclaim, Rodriguez asserts that the State violated *Brady* or *Giglio* because the State failed to disclose potential impeachment evidence that police threatened to arrest Luis's family, that Luis was given special favors while in jail, including being allowed family visits outside the jail without supervision, that Luis was permitted to have sex with his wife while in custody, and that Luis was promised help in obtaining parole. The circuit court made credibility determinations based on testimony of the prosecutor and the detectives. As addressed below, there is competent, substantial evidence that supports the trial court's factual findings. Further, Rodriguez has failed to show that he is entitled to relief on his claims.

*Rodriguez*, 39 So.3d at 288.  For the reasons below, each of these claims considered individually and cumulatively are rejected.

### 1) threats to Luis Rodriguez's family

---

[8]  Inexplicably, Petitioner also made an ineffective assistance of counsel argument within his *Brady* claim for failing to impeach Luis Rodriguez as to a prior felony conviction.  ([D.E. 32] at 62).  This claim is similar to Claim VII here.  While this claim is discussed in greater detail below, it is expressly refuted by the record and is without merit.  The Florida Supreme Court found likewise. "To the extent that Rodriguez asserts that his trial counsel rendered ineffective assistance by failing to properly impeach Luis, we conclude this claim is meritless..."  *Rodriguez*, 39 So.2d at 289, fn. 11.

Petitioner alleges that the police threatened Luis Rodriguez's family with arrest in an effort to induce his cooperation and failed to disclose that information to the defense. (*See* [D.E. 32] at 52). This allegation is based entirely on the testimony of Luis Rodriguez at the 2004 evidentiary hearing held after Petitioner's conviction and sentence. There is no other evidence in support of this allegation and it was expressly denied by the detectives investigating the murders. The Florida Supreme Court rejected this claim as follows:

> First, Rodriguez alleges that the State suppressed information that police threatened to arrest Luis's family or knowingly presented false testimony that this did not occur. During the evidentiary hearing, Luis testified that when he was first questioned, the police informed him that they had picked up members of his family (his mother, his brother Isidoro, his sister Maria Malakoff, and his former girlfriend Cathy Sundin) and showed him some documents that he thought were either indictments or confessions. According to Luis, the police further informed him that Rodriguez was blaming everything on Luis. Officers Smith and Crawford testified that they did not threaten to arrest Luis's family. The circuit court denied this claim, finding that even if this allegation was true, Rodriguez failed to show prejudice because Luis was vigorously cross-examined at trial as to his motives for testifying against Rodriguez.
>
> We conclude that Rodriguez has failed to show that the police threatened to arrest Luis's family if he did not cooperate. Moreover, even if this Court accepted his allegations as true, Rodriguez has failed to show prejudice-i.e., that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290, 119 S.Ct. 1936 (*quoting Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). The jury was presented with significant impeachment evidence against Luis, including his plea agreement and that he was given some preferential treatment.

*Rodriguez,* 39 So.2d at 288-89. The Court concurs with the determination of the Florida Supreme Court. Indeed, the detective testified that Luis Rodriguez's family was never threatened with arrest or prosecution nor were any documents presented which indicated that any member of his family was the subject of an indictment. ([D.E. 16-90] at 73). As such, the merits of the claim hinges upon the credibility of the witnesses who appeared before the trial court. As discussed in greater detail below,

the credibility of the witness is a determination for the trial court not a federal habeas court. *See*

*Freund v. Butterworth*, 165 F.3d 839 (11th Cir. 1999).

### 2) special favors

Petitioner contends that the State failed to disclose that certain privileges and special

treatment were given to Luis Rodriguez by police detectives in order to induce him to cooperate and

testify against Petitioner. ([D.E. 32] at 51). The Florida Supreme Court denied this claim as follows:

> Second, Rodriguez alleges that the State violated *Giglio* and *Brady* by suppressing information that in order to obtain Luis's cooperation in testifying against Rodriguez, Luis was provided with special accommodations, including unsupervised visits with his family and being permitted to have sexual relations with his wife while in jail. At trial, the jury heard testimony from Luis himself that he was permitted to have visits with various members of his family, he had informed his attorneys about these visits, and his attorney asked him to take pictures of the visits because the attorney could not believe that the visits were being permitted. Luis further testified at the trial that he had a meeting with his wife alone for about five or ten minutes and that during this time, he had sexual relations with her. However, he testified that he did not know if the police were aware of this. Trial defense counsel cross-examined Luis about these incidents at trial.
>
> At the evidentiary hearing, Luis testified that while he was unsure whether the police knew that he had sexual relations with his wife, the officers did suggest that, if he needed privacy with his wife, he should place a sticker over the peephole in the window of the door. The two officers testified at the evidentiary hearing that they were not aware Luis had sex with his wife and denied that they granted him permission to have sexual relations by using stickers to cover the peephole. The prosecutor testified that he did not knowingly present false testimony when the detectives testified at trial that they did not permit Luis to have sexual relations with his wife.
>
> The circuit court denied this aspect of the claim, finding that Luis's statements lacked credibility and that the police officers provided credible testimony. This Court is "bound by the trial court's credibility determinations and factual findings to the extent they are supported by competent, substantial evidence." *Jones*, 998 So.2d at 580. Upon review, we find that competent, substantial evidence supports the trial court's factual findings. Luis's recent testimony was contrary to his prior sworn statements at trial, and at times his testimony at the evidentiary hearing conflicted with other statements that he made during the hearing. Because Luis's testimony was the primary support for this claim and his testimony was found to be not credible,

33

Rodriguez is unable to establish the first prong of either a *Brady* violation or a *Giglio* violation. Further, even assuming the change of testimony that the police may have known about the sexual relations, the jury was already aware that Luis was being provided with special treatment and that the police knowingly permitted him to have some private time with his wife. Therefore, Rodriguez cannot establish either materiality or prejudice.

*Rodriguez*, 39 So.2d at 288-89. If these allegations of special treatment were true *and* had been withheld from the defense, this may well constitute a *Brady* violation. However, the record does not support Petitioner's claim.

Petitioner argues that Luis Rodriguez was allowed to have sexual relations with his wife and have family visits while in jail, which information should have been disclosed to the defense. The claim perplexes since this information was known by the defense and, in fact, Luis Rodriguez testified at trial, in front of the jury, about the sexual relations with his wife and his family visits. Thus, there could be no real prejudice resulting from the State's failure to disclose. Petitioner then attempts to modify this claim by arguing that it was not the fact of the special treatment being withheld, rather it was that the police's knowledge of the special treatment that was improperly withheld. While the Court is not convinced that this could even qualify as a *Brady* violation, it is unsupported by the record. Similar to the preceding claim, the issue becomes one of credibility which is not a determination for the Court.

### 3) parole

Petitioner asserts that Mr. Laeser failed to disclose that the State promised to assist Luis Rodriguez with early release. ([D.E. 32] at 54). This claim is not supported by the record. At trial, Luis Rodriguez specifically testified that there was no agreement with the State for him to be released on parole. ([D.E. 16-60] at 59-60). Even after Petitioner's trial, Luis Rodriguez has still not testified that he was promised parole. ([D.E. 16-90] at 60). Specifically, at the 2004 evidentiary

hearing, Luis Rodriguez testified that based on a prior conversation he "expect[ed] the State to write letters on [his] behalf to authorities concerning parole or the length of [his] sentence." (*Id.*). This is not the same thing as promising to have someone granted parole. The Florida Supreme Court determined Petitioner was entitled to no relief based on the following:

> Finally, Rodriguez claims that the prosecutor presented false testimony and failed to disclose that Luis was promised assistance in obtaining parole if he testified against Rodriguez. Although Luis was initially charged with first-degree murder and was facing the death penalty, he avoided this potential penalty by accepting a plea deal with the State in which he pled guilty to second-degree murder. At trial, the jury was informed as to Luis's plea agreement, and Luis was vigorously cross-examined as to his motives for testifying against Rodriguez. The circuit court denied this portion of the claim.

> Other than vague, conclusory statements, Rodriguez failed to present any evidence to support his claim. During the evidentiary hearing, Luis testified that he thought he would be receiving assistance in obtaining parole based on some conversations he had "behind closed doors." No specifics of these conversations were provided. Luis's lawyer also was unable to provide any details as to specific assistance that Luis was to be given if he testified against Rodriguez. Luis agreed at the evidentiary hearing that the plea agreement expressly states that no promises were being made about his sentence. Because Rodriguez has failed to sufficiently support his allegation as to an undisclosed agreement, he is not entitled to relief.

*Rodriguez*, 39 So.3d at 288-90. The Court agrees with the determination of the Florida Supreme Court as to this claim.

As indicated above, the Court rejects all Petitioner's *Brady* and *Gigilio* claims. Primarily these claims hinge on the credibility of Luis Rodriguez because no documented evidence exists to support Petitioner's claims. As such, the claims are difficult to prove. The testimony presented at the evidentiary hearing created a question of credibility which the trial court resolved. Luis Rodriguez's testimony was in direct conflict with the testimony of the two detectives who were the

subject of the claim regarding special treatment that he received for testifying against Petitioner.[9] It also conflicted with Luis Rodriguez's own trial testimony. In order to determine if material was withheld, the trial court made a credibility determination. The credibility of the witness is a determination for the trial court not a federal habeas court. *See Freund v. Butterworth*, 165 F.3d 839 (11th Cir. 1999) (citing *Marshall v. Lonberger*, 459 U.S. 422 (1983) ("Title 28 USC § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Here, the state courts have determined this issue and the record does not reveal that the Court's deference to the state supreme court's determination would be misplaced.

"Questions whose resolution depend heavily on the trial court's appraisal of witness credibility and demeanor are deemed questions of fact." *Saldo v. Crosby*, 162 Fed. Appx. 915 (11th Cir. 2006)(citing *Freund v. Butterworth*, 165 F.3d 839, 862 (11th Cir.1999)(en banc)). "A determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e). The Court has reviewed the relevant portions of the testimony presented at the 2004 evidentiary hearing held in state court, and finds that Petitioner has not met the presumption prescribed by 28 U.S.C. §2254(e).

Further, even if this information had been suppressed, Petitioner has failed to show prejudice. At trial, Luis Rodriguez was cross examined at length regarding his cooperation with police, his plea

---

[9] The exception being the claim regarding the police officers knowing that he engaged in sexual relations with his wife while in police custody. To date, Luis Rodriguez has not testified that the police *knew at the time* of his visitation with his wife that this was to occur. Rather, he testified that "I don't know if they knew or not but I did brag about it at one time to them and they didn't want to know about it." ([D.E. 16-90] at 55).

agreement[10] and his avoidance of the death penalty in exchange for his testimony against Petitioner. Nothing that Luis Rodriguez testified to at the evidentiary hearing would create "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  All claims in this section relating to Luis Rodriguez are rejected.

### ii. Isidoro Rodriguez

Isidoro Rodriguez is Luis Rodriguez's brother.  Isidoro Rodriguez also gave inculpatory testimony against Petitioner. Petitioner's defense at trial was that both Isidoro and Luis Rodriguez actively participated in the crime and Petitioner was merely a lookout. Isidoro Rodriguez, however, established at trial that he was in Orlando at the time of the murder. Nevertheless, because Isidoro Rodriguez admitted some involvement in events after the crime (that he had disposed of jewelry discovered by his mother underneath her trailer) and because Luis Rodriguez was Isidoro Rodriguez's brother, any impeachment of Isidoro Rodriguez also could have been helpful to the

---

[10] The plea agreement specifically stated that the State would communicate with the proper authorities regarding Luis Rodriguez's cooperation.

> The Office of the State Attorney specifically does agree to directly communicate with the proper authorities, in writing, to notify them of the terms of this agreement; and that the defendant has fully co-operated, pursuant to these terms, when he has testified against Manuel 'Tony' Rodriguez, the co-defendant. The length of actual sentence served, however, shall be in the exclusive control of the Department of Corrections. There is also no promise, express or implied, that the defendant will serve any specified portion of any of these prison sentences.

*Rodriguez*, 45 So.3d 966, 967 (Fla. 3d DCA 2010).

defense's case.  *Id.*   As to Isidoro Rodriguez, Petitioner claims are a combination of *Brady* and

*Giglio* violations and ineffective assistance of trial counsel.  The Florida Supreme Court summarized

his claims as follows:

> Rodriguez alleges ineffective assistance in his defense lawyer's failure to impeach
> Isidoro, violations of Brady by the State's failing to disclose potential impeachment
> evidence pertaining to Isidoro, and violations of Giglio by the State's knowing
> presentation of false testimony. Rodriguez raises four distinct claims pertaining to
> Isidoro: (a) alleged secret dockets in Dade County involving Isidoro; (b) alleged
> involvement in drug activity and police investigations into such allegations; ©
> alleged threats made by police to Isidoro; and (d) an alleged relationship between
> Isidoro and a member of the police department.

*Id.* at 289. Petitioner makes similar claims here. The Florida Supreme Court issued a comprehensive

and lengthy opinion on these claims. Petitioner fails to cite it and does not attempt to argue why the

decision resulted in a determination which was contrary to, or involved an unreasonable application

of, clearly established federal law, as determined by the Supreme Court. He also fails to argue that

it was based on an unreasonable determination of the facts in light of the evidence presented.

Petitioner simply ignores the dictates of the AEDPA.[11]   Nonetheless, the Court has analyzed all

Petitioner's claims regarding Isidoro Rodriguez.[12]

---

[11] "As a condition for obtaining habeas corpus from a federal court, a state prisoner must
show that the state court's ruling on the claim being presented in federal court was so lacking in
justification that there was an error well understood and comprehended in existing law beyond
any possibility for fairminded disagreement."  *Harrington*, 131 S.Ct at 786-87.

[12] The Florida Supreme Court analyzed a claim regarding "secret dockets" as a separate
and distinct claim.  Petitioner now argues that this is not a separate claim but rather cumulative
"evidence that the State protected Isidoro." ([D.E. 32] at 68, n.18).  As such, the Court does not
review this allegation as one of a separate and distinct claim for habeas relief.  Nonetheless, the
Florida Supreme Court rejected the claim finding "Rodriguez has not presented any evidence that
a secret docket exists concerning Isidoro. Despite the fact that several witnesses testified that
they were unable to find any hidden or secret dockets concerning Isidoro, Rodriguez alleges that
secret dockets could still exist involving this witness. Rodriguez's claim as to this issue is

*a. Seminole County Investigation*

Petitioner argues that the State failed to disclose a criminal investigation of Isidoro Rodriguez in Seminole County, Florida for a narcotics related offense. ([D.E. 32] at 66).  He asserts that had that information been known, or had trial counsel utilized the information, Isidoro Rodriguez would have been questioned about it in a pre-trial deposition.  (*Id.* at 68).  This claim was argued in Petitioner's Rule 3.850 postconviction motion.  The claim was denied and the Florida Supreme Court affirmed.

> The fact that Isidoro was investigated in Seminole County would not have been admissible as impeachment. Under § 90.610, Fla. Stat., only contact which results in a criminal conviction is admissible to prove bad character. Since Isidoro was not arrested, he was not convicted. It's possible Isidoro didn't know he was investigated.
>
> As the postconviction court pointed out, Rodriguez fails to establish how testimony and information concerning the Seminole County investigation could be admissible at trial on the murder charges against Rodriguez or have led to any favorable evidence. Isidoro was never arrested or charged with any criminal drug activity; police received only a tip involving possible narcotics violations at a residence in which Isidoro lived. Rodriguez presents no evidence that Isidoro was even aware that he was being investigated. Even assuming that Rodriguez could show the evidence was exculpatory or proper impeachment evidence, he clearly cannot show any prejudice-i.e., that this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Smith*, 931 So.2d at 796 (*quoting Strickler*, 527 U.S. at 290, 119 S.Ct. 1936).

*Rodriguez*, 39 So.3d at 291. The Court agrees. This claim is speculative, at best.  First, whether or not this information would have been admissible is a question of state law.  The Court does not review questions of state law"[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. at 67-68;  *Wilson v. Corcoran*, 131 S.Ct. 13 (2010).  The Court may not review evidentiary determinations such as this

―――――――――

completely speculative and without any [record] support." *Rodriguez*, 39 So.3d at 290-91.  The Court agrees.

one.  It matters little though because even if this information had been revealed and was admissible,

Petitioner has not shown prejudice as required by *Brady*.  The Court finds that even if, Isidoro

Rodriguez was cross-examined about his alleged narcotics-related activities, that it would not have

resulted in a reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different.  *Bagley*, 473 U.S. at 682.  This claim is rejected.

### b. Police Coerceion

Petitioner titles this claim as 'Isidoro was pressured into testifying for the State."  It is unclear

as to what type of legal claim Petitioner is attempting to assert here. ([D.E. 32] at 72-76).  Perhaps

it is a *Brady* claim for failing to disclose certain alleged threats made by the police to induce Isidoro

Rodriguez to testify.  Perhaps it is an ineffective assistance of counsel for failing to discredit or

impeach Isidoro Rodriguez about his cooperation with police.  The claim as drafted does not make

a single legal argument.[13]  The Court is not inclined to speculate what claim is attempted to be made

by Petitioner.  The record does not support any claim relating to alleged coercion.

### c. Relationship with Miami-Dade police

This claim suffers a similar defect to that of Petitioner's claim that the police used threats to

obtain Isidoro Rodriguez's cooperation.  It states no legal basis for any claim upon which habeas

---

[13]  On appeal from the denial of his Rule 3.850 postconviction motion, Petitioner argued this claim as one of ineffective assistance of counsel.  The Florida Supreme Court affirmed the denial. "There is competent, substantial evidence that supports the trial court's factual findings that no evidence was introduced to show that Isidoro was threatened or promised favors in exchange for his cooperation. Accordingly, we deny this subclaim. Defense counsel cannot be considered ineffective for failing to impeach Isidoro on evidence that did not exist." *Rodriguez*, 39 So.3d at 292.  Based on the record, the Court finds that the Florida Supreme Court's determination was not contrary to, or an unreasonable application, of clearly established federal law.  Nor was the ruling based on an unreasonable determination of the facts.

relief can be granted. (*See* [D.E. 32] at 76-78).  Petitioner's argument centers around how the outcome may have been different if the jury had known that Isidoro Rodriguez was related to a Miami-Dade police officer.  Petitioner does not advise the Court of whether the jury did not know this information because the State failed to disclose it in violation of *Brady* or if the jury did not know this information because his lawyer was ineffective and failed to present this to the jury. And, of course, there is no showing of prejudice.  Again, the Court declines to speculate as to what is this claim.[14]  All claims in this section relating to Isidoro Rodriguez are rejected.

### B. Ineffective Assistance of Trial Counsel

In this claim, Petitioner argues several claims of ineffective assistance of trial counsel. ([D.E. 32] at 65).

### i. Failure to Present Evidence Implicating Isidoro Rodriguez

Petitioner argues that "[d]efense counsel should have known that Luis [Rodriguez] admitted that he and another person were going to leave Orlando and travel to Miami to commit a crime and that Isidoro is the person picked him up at his home to go travel south."[15]  ([D.E. 32] at 65).

---

[14] The Florida Supreme Court interpreted this claim as a *Brady* violation.  The court, agreeing with the conclusion of the postconviction court, determined "Rodriguez has not demonstrated that the relationship between Isidoro and Lieutenant Villanueva was favorable evidence, and thus he cannot meet the first prong of *Brady*.  Further, Rodriguez cannot establish prejudice because this type of attenuated impeachment evidence could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Smith*, 931 So.2d at 796 (*quoting Strickler*, 527 U.S. at 290, 119 S.Ct. 1936)."  Based on the record, the Court finds that the Florida Supreme Court's determination was not contrary to, or an unreasonable application, of clearly established federal law.  Nor was the ruling based on an unreasonable determination of the facts.

[15] The Court assumes that this is a claim for ineffective assistance of counsel because it does at least reference counsel in the claim.  However, the claim still fails to: 1) argue the *Strickland* standard or 2) articulate how this claim meets the two requisite prongs for a

Petitioner first made this claim in his Rule 3.850 postconviction motion. The Florida Supreme Court rejected this claim finding "[c]ontrary to Rodriguez's allegations regarding this claim, he failed to present any testimony to establish that such available evidence existed." *Rodriguez*, 39 So.3d at 293. The Court after having reviewed the trial and postconviction hearing transcripts agrees. Counsel performance cannot be deficient for failing to introduce evidence which did not exist. This claim is rejected.

### ii. Edgar Baez

Petitioner further asserts that his counsel "should have called Edgar Baez as an eyewitness to the crime." ([D.E. 32] at 65). Petitioner made a similar claim on appeal of the denial of his Rule 3.850 postconviction motion. The Florida Supreme Court affirmed the denial.

> In the next claim we address, Rodriguez asserts that his counsel was ineffective during the guilt phase because he failed to present the testimony of Edgar Baez, a witness who saw a man taking a woman into the Josephs' apartment around the time of the murders. Rodriguez asserts that Baez's testimony could demonstrate that the person Baez saw at the time of the crime did not match Luis or Rodriguez but could have been Isidoro. Specifically, Baez was across the street on the day of the murder and saw a man let an older woman (presumably Abraham) into the apartment. Baez had described the man he saw very briefly in a 1984 sworn statement, and a composite sketch was prepared. Baez remembered that a sketch was made but did not recall if he was shown the final picture. Nor could Baez attest that the sketch he helped make, and which he was shown at the hearing, resembled the person he saw in 1984. In reviewing the entire record as it relates to this claim, we affirm the trial court's denial of relief because, based on the evidence presented, Rodriguez is unable to establish either deficiency or prejudice in failing to present Baez as a witness.

*Rodriguez*, 39 So.3d at 293. In 2004, the trial court held an evidentiary hearing wherein Mr. Baez testified. (*See* [D.E. 16-88] at 21-38). His testimony at the hearing offered little to no evidence which would have shown that Petitioner's counsel was deficient for failing to call him or how

---

Constitutional violation. ([D.E. 32] at 64-66).

Petitioner was prejudiced by that failure. At the hearing, postconviction counsel asked trial counsel, Mr. Houlihan, why he did not call Mr. Baez to the stand during the trial. His testimony was that he could not remember. (*See* [D.E. 16-89] at 101). Given the record here, the Court concurs with the Florida Supreme Court's opinion as it is a reasonable application of facts and law. The court found that Petitioner failed to show deficiency or prejudice. Petitioner's current argument is speculative at best, without any record evidence to suggest that had Mr. Baez been called that "there is a reasonable probability that, but for counsel's unprofessional errors that the result of the proceeding would have been different." *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993)*; Strickland*, 466 U.S. at 694. Further, "[a] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e). Petitioner has failed to do so. The claim is rejected.

### C. Prosecutorial Misconduct

Petitioner contends that the prosecution mislead the jury regarding the undisclosed consideration given to the co-defendant, Luis Rodriguez. ([D.E. 32] at 56). Petitioner also alleges that the State improperly bolstered Luis's credibility. ([D.E. 32] at 61). In the instant petition, Petitioner argues that the "circuit court and the Florida Supreme Court ignored the statement of the prosecutor and the lead detective with regard to misleading the jury. This Court should review the issue de novo." ([D.E. 32] at 59). It is true that the Florida Supreme Court did not make a determination as to this claim. In Petitioner's Initial Brief to the Florida Supreme Court, this claim was filed under the heading: "Manuel Rodriguez is Entitled to a New Trial Due to the Deprivation of the *Effective Assistance of Counsel* and the Violation of His Due Process Rights Under *Giglio* and

43

*Brady*." ([D.E. 16-5] at 15-22)[16](emphasis added).  The State argues that this claim for prosecutorial misconduct is unexhausted because it was not presented to the state courts.  The State is correct.  The Court has carefully reviewed the claims made to the Florida Supreme Court and here. The Court finds that at the state court level, the underlying facts of this claim are the same but the legal argument was different.  (*See* [D.E. 16-5] at 22).  Here, the claim lacks clear argument but appears to be more of one for prosecutorial misconduct in that *Brady* was not even cited.  (*See* [D.E. 32] at 56-59).  Accordingly, it is unexhausted and procedurally barred from further review.  *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *see also* Order at 11-12.   "When a petitioner fails to properly raise his federal claims in state court, he deprives the State of "an opportunity to address those claims in the first instance" and frustrates the State"s ability to honor his constitutional rights."  *Cone v. Bell*, 129 S.Ct. 1769, 1780 (2009)(internal citations omitted).   Even if the claim were not unexhausted, the Court finds that it lacks merit. It primarily argues that the State violated Petitioner's constitutional right to a fair trial by improperly bolstering its' key witness and failing to correct error in the testimony made by Miami-Dade police detectives in violation of *Giglio*.  To make out a valid *Giglio* claim, a petitioner "must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material - i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (per curiam) (quotation marks, alterations, and citation omitted).  Petitioner has not done so here.  The testimony cited by Petitioner has not been proven to be perjured.  It is best categorized as a difference of opinion between the

---

[16] On appeal to the Florida Supreme Court, Petitioner had an entire page of legal argument devoted to a *Brady* violation on this claim.  However, Petitioner has abandoned that legal argument here by failing to include it in the petition.  (*See* [D.E. 16-5] at 22).

detectives and the prosecutor regarding the intent behind allowing Luis Rodriguez "special" privileges. (*See* [D.E. 32] at 56-59). Further, a review of the arguments made by the prosecutor do not show that improper bolstering occurred.

> "When faced with a question of whether improper vouching occurred we ask: 'whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility.' " *United States v. Castro*, 89 F.3d 1443, 1456-57 (11th Cir.1996) (*quoting Sims*, 719 F.2d at 377). "In applying this test, we look for whether (1) the prosecutor placed the prestige of the government behind the witness by making explicit assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony." *Id.* at 1457.

*United States v. Sosa*, 208 Fed. Appx. 752 (11th Cir. 2006). Neither has been established. Petitioner's claim fails.

### D. Trial Court Error

Petitioner asserts that the trial court erred when it allowed the State to call, Maria Malakoff, Petitioner's girlfriend, to the stand solely to impeach her testimony, in effect offering impeachment evidence as substantive evidence.. ([D.E. 32] at 80). At trial Malakoff testified that:

> Malakoff testified that she and Manuel had two children, one of whom died in 1984. She stated that members of her family did not like her or Manuel. She also said that Manuel was not angry with Sam Joseph at the time of the murders and that she did not believe that Manuel was involved in the murders. The State impeached her testimony through her sworn statement to the police in 1993, in which she said that Manuel had been angry with Sam Joseph and on the day of the murders had called him a son-of-a-bitch. Additionally, in her pretrial statement, she said that Manuel told her he killed Sam Joseph when Joseph reached for a gun; that he had made sure that Luis killed Abraham; and that Manuel made sure they were all dead.

*Rodriguez*, 753 So.2d at 35. Petitioner asserted the reliance of Malakoff's testimony during the penalty phase as error on direct appeal. ([D.E. 16-1] at 111-12). Here, Petitioner's titled this claim as though it was one of trial court error but the substance of the claim is ineffective assistance of

45

appellate counsel.  Petitioner concedes that his appellate counsel did not challenge the "trial court's reliance on Malakoff's impeachment and police statement as substantive evidence when he challenged the trial court's findings of the 'avoid arrest' aggravator." ([D.E. 32] at 83).  He argues that his appellate counsel was ineffective for failing "to challenge the trial court's erroneous ruling permitting the impeachment."  To the extent that Petitioner is arguing trial error as the substantive claim, it is denied as unexhausted and insufficiently plead.  A discussion of his ineffective assistance of appellate counsel follows.

### E. Ineffective Assistance of Appellate Counsel

Petitioner asserts that his appellate counsel was ineffective in three ways.  First, when counsel failed to argue on direct appeal that the trial court erred when it allowed the State to call Malakoff to the stand to impeach her testimony but then accepted the impeachment evidence as substantive. ([D.E. 32] at 80).  Second, Petitioner argues that his appellate counsel should have argued that it was trial error to limit Petitioner's questions on cross examination. ([D.E. 32] at 85).  Finally, Petitioner makes a cumulative effect claim. (*See* [D.E. 32] at 88).  Petitioner made these three claims in his state petition for writ of habeas corpus. (*See* [D.E. 16-8] at 55,57 & 80).  The Florida Supreme Court denied all three claims because "they would have been rejected on direct appeal, and therefore Rodriguez cannot establish either deficiency or prejudice." *Rodriguez*, 39 So.3d at 295.  The Court concurs with the Florida Supreme Court and finds that this determination was not contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court or that there was an unreasonable determination of the facts.

> Although a federal court reviewing a state prisoner's habeas petition may not "reexamine state-court determinations on state-law questions," *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991), it may review state evidentiary rulings to determine whether the rulings violated the petitioner's due

> process rights. *Felker v. Turpin*, 83 F.3d 1303, 1311-12 (11th Cir.1996). In such instances, the inquiry is limited to determining whether evidentiary errors " 'so infused the trial with unfairness as to deny due process of law.' " *Id.* (quoting *Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941)). The determination of whether an evidentiary error is of such magnitude as to deny fundamental fairness is to be made in light of the evidence as a whole. *Id.* at 1312.

*Williams v. Allen,* 324 Fed. Appx. 756 (11th Cir. 2009). The Court has reviewed the testimony at issue here and finds that, even if the trial court did err as to certain evidentiary rulings (which the Court does not so find here), those rulings did not render the entire trial fundamentally unfair. This is true of the individual and cumulative effect claims made here.

### i. Impeachment Evidence

At trial, Malakoff testified differently from the statement she had previously given to the police. The State was entitled to impeach her testimony with a prior inconsistent statement. Prior to admission of that statement, the jury was instructed "[l]adies and gentleman, at this time the testimony that you are about to hear is being admitted for the sole purpose of impeaching the prior witness's testimony in court. This evidence must not be considered as substantive evidence. It may only be considered in weighing the credibility of the witness's prior courtroom testimony." ([D.E. 16-62] at 54). This was not error. Appellate counsel cannot be deficient for failing to raise a nonmeritorious argument.

### ii. Cross-Examination

As to Petitioner's claim that he was unreasonably limited on his cross-examination of certain witnesses, he makes very limited citations to the record where this alleged limitation purportedly occurred. The Court only considered those portions of the record specifically cited by the Petitioner. In doing so, it became clear that this claim is refuted by the record.

As to Anastasia Rodriguez, Petitioner argues that he was unreasonably restricted during his

cross-examination at pages 2125-2126.  ([D.E. 32] at 85).  The record reveals only two sustained objections on those two pages.

> **Q**: "And they [the police] would tell you what?"
>
> **Mr. Laser**[17]: Your honor, I must object. This is.
>
> **The Court**: Sustained as to what was told.

([D.E. 16-53] at 26).  The second objection was

> **Q**: "Would your son always just called [sic] the homicide office during this matter?"
>
> **Mr. Laser**: Objection, your honor.
>
> **The Court**: Sustained.

([D.E. 16-53] at 27).  Neither one of these rulings by the trial court was improper, let alone render Petitioner's trial fundamentally unfair.

As to Detective Greg Smith, Petitioner argues that he was unreasonably restricted during his cross-examination at pages 3183-84.  ([D.E. 32] at 86).  The record reveals that there were no objections by the State on either one of those pages of transcript.  In fact, the cross-examination of Detective Smith began at page 3156 of the transcript, it ended on page 3198.  During the course of the cross-examination, the trial court sustained only three objections.

> **Q**: And during that entire time, in fact during that time depositions of you were being taken during that very time. I believe your deposition was being taken by his lawyers. So they did not know that he was having these visits.
>
> **Mr. Laeser**: Objection, Your Honor. It calls for a conclusion as to what his lawyers knew.
>
> **The Court**: Sustained.

---

[17] The Assistant State Attorney assigned to Petitioner's case was Abraham Laeser. Sometimes in the transcript, he is denoted as Mr. "Laser".

* * *

**Q**: Was there any indication by his lawyers when they questioned you - -

**Mr. Laeser**: Objection. Same Objection.

**The Court**: Sustained.

* * *

**Q**: Was there any indication by his lawyers as they were questioning you that they knew about these visits?

**Mr. Laeser**: I'm sorry. That was the exact words of the last question.

**The Court**: Sustained.

 (*See* [D.E. 16-63] at 86, 88).  Not only does Petitioner incorrectly cite the record, his argument mischaracterizes the State's objection and the court's ruling. Petitioner argues that he was limited in questioning Detective Smith regarding "his knowledge of the relationship between Luis and the state attorneys and law enforcement." ([D.E. 32] at 85).  However, as outlined above, Petitioner was limited in cross-examining Detective Smith about Luis Rodriguez's lawyer's possible knowledge, not Smith's knowledge.

As to Isidoro Rodriguez, Petitioner argues that his trial counsel was precluded from "asking Isidoro whether he knew if his brother Luis had killed anyone" during his cross-examination on page 2506 of the transcript.  In fact, the testimony was as follows:

**Q**: Did your brother Luis, to your knowledge, kill anybody in this case, he himself?

**Ms. Solly**: Objection.

**The Witness**: I don't know.

49

> **Ms. Solly**: Objection.

> **The Court**: Sustained.

([D.E. 16-57] at 8-9). The question was answered, Isidoro didn't know. There was no error, much less a ruling which rendered Petitioner's trial fundamentally unfair. As to Malakoff, Petitioner argues that "[t]he court prohibited the defense from asking Maria Malakoff questions about her prior statement regarding the alibi for the night of the homicide. (T. 2717-25)." This statement is directly refuted by the record. At sidebar, the trial judge overruled the State's objection as follows:

> **The Court**: Just in response, first of all, I don't think the predicate has been laid yet. But in response to the state's objection, I think that this testimony if a proper predicate is laid can come in for purposes other than to show alibi, but to show she has given a statement consistent with the testimony she has given in court today.

> So I would overrule the state's objection providing you lay the proper predicate, which has not yet been laid.

([D.E. 16-59] at 23). The trial court did not "prohibit[] the defense" from inquiring about Malakoff's prior statement. Indeed, the trial court later assisted counsel for the defense in laying the proper predicate, suggesting appropriate questions to ask to lay the necessary foundation. (*See* [D.E. 16-59] at 26-27). Once the proper foundation was laid, defense counsel asked questions, without objection, regarding her prior statement. (*See* [D.E. 16-59] at 29-30). Clearly, this argument has no merit.

Finally, Petitioner claims that his counsel was precluded "from presenting a complete defense by restricting cross-examination of the detectives regarding their investigations in the Joseph's police record and their known arms dealing." ([D.E. 32] at 86). One of the victims had a prior conviction in federal court for the sale of arms to persons residing in Lebanon some fifteen years prior to the instant crime. Defense counsel indicated that he intended to inquire about that with the detective who was testifying. The trial court sustained the objection because "[f]irst of all, it is obviously

50

hearsay.  It doesn't come in because it is hearsay.  Secondly, what is the possible relevance of this but to inflame or prejudice the jury." ([D.E. 16-53] at 98-99).  The Court does not find that this ruling was improper or rendered Petitioner's trial fundamentally unfair.  Having found each of these claims without merit, Petitioner cumulative effect claim is also rejected.  Petitioner made these claims in his state petition for writ of habeas corpus.  The Florida Supreme Court denied this claim because

> Rodriguez must first establish that his appellate counsel's performance was deficient because of errors that are of such magnitude and are so serious that they fall outside the range of professionally acceptable performance. *Id*. Second, Rodriguez must establish that he was prejudiced because of the deficiency. In determining if prejudice is shown, it must appear that appellate counsel's deficient performance "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." *Id*. (*quoting Thompson v. State*, 759 So.2d 650, 660 (Fla.2000)).

> None of the first eight claims warrant relief because the underlying claims of error would have been rejected on direct appeal, and therefore Rodriguez cannot establish either deficiency or prejudice

*Rodriguez*, 39 So.3d at 295.  As the Court previously found this claim to be without merit, the Florida Supreme Court's opinion has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  If the trial court did not err, then appellate counsel cannot be faulted for not raising this issue on appeal.  *See Jones v. Campbell*, 436 F.3d 1285, 1304 (11th Cir. 2006).  Thus, this claim for relief is rejected.

***IV. Whether Petitioner was denied a fair trial and a fair, reliable and individualized capital sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.***

Petitioner argues that his sentencing phase violated the Fifth, Sixth, Eighth and Fourteenth Amendments because of prosecutorial misconduct resulting in impermissible arguments being made before the jury, including misstatements of the law and inflammatory and improper statements of facts.  He also asserts ineffective assistance of counsel. ([D.E. 32] at 95).

### A. Prosecutorial Misconduct

Petitioner asserts that the assistant state attorney interjected the sentencing phase with improper and misleading comments, and comments not supported by the evidence. ([D.E. 32] at 96).  Specifically, Petitioner contends that the prosecutor put on improper victim impact testimony and evidence of prior bad acts which were improper.  (*Id.*).

### i. victim impact testimony

Petitioner fails to articulate a clear basis for his victim impact testimony claim other than to argue that the "error of allowing Virginia Nimer and Tama Zydon [sic] testify regarding irrelevant information violated Manuel Rodriguez's right to a fair trial."  ([D.E. 32] at 97).  To the extent Petitioner is arguing trial error or prosecutorial misconduct, that claim is unexhausted and procedurally barred as it was not made on direct appeal.  *See Rodriguez v. State*, 753 So.2d 29 (Fla. 2000).  While it is not completely clear, it appears from the headings that this claim was intended to be one of prosecutorial misconduct.  Or the claim may be intended to be one of ineffective assistance of trial counsel for failing to object to the testimony at trial or for failing to make this claim on direct appeal.  The claim, as drafted, provides no direction for the Court, no specific legal argument or legal precedent.  Petitioner simply argues that he was denied his "right to a fair trial."   Thus, the Court is at a lost to discern any viable, articulated claim here and concludes there is

52

none.[18]  To the extent that this is part of a more global cumulative effect of error claim, the Eleventh

Circuit has held that unless the trial was rendered fundamentally unfair, the courts should decline

to entertain "cumulative error" claims .  *See Cargill v. Turpin*, 120 F.3d 1366, 1386-87 (11th Cir.

1997); *see also* Order at 11-12.  This claim must be rejected.

### ii. prior bad acts

Petitioner argues that the prosecutor elicited testimony from Luis Rodriguez regarding two

prior incidents where Petitioner had acted violently.  (*See* [D.E. 32] at 97).  During cross-

examination, defense counsel explored Luis Rodriguez's bias against Petitioner by asking if he

disliked Petitioner. Luis Rodriguez affirmed that he did based on Petitioner's treatment of his sister

and niece.  On re-direct, the State argued that Petitioner had opened the door to further questioning

on his dislike of Petitioner which resulted in the testimony regarding a prior incident wherein Luis

Rodriguez witnessed Petitioner assault another person.  The trial court allowed the State to proffer

the intended testimony.  Petitioner argued that the prejudicial nature of the testimony outweighed

the probative value.  The trial court then excluded some, and admitted some of the proffered

testimony.  Petitioner first made this claim on direct appeal of his conviction and sentence.  (*See*

[D.E. 16-1] at 80).  The Florida Supreme Court denied this claim finding:

> In this case, Manuel Rodriguez attempted to establish that Luis Rodriguez disliked
> him in order to show Luis's bias against him. Thus, it was appropriate for the trial

---

[18] Petitioner made claims of ineffective assistance of trial and appellate counsel as to this
issue in both his postconviction motion and state petition for writ of habeas corpus.  Both claims
were denied because they were "refuted by the record" or "without merit" or "would have been
rejected on direct appeal."  *Rodriguez*, 39 So.3d at 284, n.8, 295 (Fla. 2010).  Based on the
record, the Court finds that the Florida Supreme Court's determination was not contrary to, or an
unreasonable application, of clearly established federal law.  Nor was the ruling based on an
unreasonable determination of the facts.

court to consider whether to admit evidence that would explain the basis for Luis's dislike of Manuel. Accordingly, the only issue before this Court is whether the probative value of this testimony outweighed its prejudicial impact.

A trial judge is afforded significant discretion in determining whether the prejudicial nature of evidence outweighs any relevance the evidence may have at trial. *See, e.g., Williamson v. State,* 681 So.2d 688, 696 (Fla.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997). As we stated in *Williamson*:

Almost all evidence introduced during a criminal prosecution is prejudicial to a defendant. *Amoros v. State*, 531 So.2d 1256, 1258 (Fla.1988). In reviewing testimony about a collateral crime that is admitted over an objection based upon section 90.403, [Florida Statutes (1999),] a trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded.... The testimony [at issue] was integral to the State's theory of why its key witness acted as he did both during and after the criminal episode. Had the trial judge precluded [this] testimony, the jury would have been left with a materially incomplete account of the criminal episode. Thus, we conclude that the trial judge did not err in admitting this testimony.

*Williamson*, 681 So.2d at 696 (citations omitted). In this case, the State's theory was that Manuel Rodriguez was the instigator of the crimes and that Luis Rodriguez shot Abraham because he feared Manuel. In admitting this testimony, the trial court significantly limited what Luis could say before the jury, eliminating much of what was said in the proffer based on the fact that the testimony would be unduly prejudicial to Manuel. We conclude that, under these circumstances, the trial court reached a proper balance in excluding a significant amount of prejudicial evidence but in allowing the evidence that would show why Luis disliked Manuel and why he feared him.

*Rodriguez*, 753 So.2d 29, 41-43 (Fla. 2000). The Court agrees with the Florida Supreme Court's

analysis and conclusion. Tellingly, Petitioner fails to cite a single case or constitutional provision

in support of his argument.  Nor does he argue why the Florida Supreme Court's determination was

contrary to, and did involve an unreasonable application of, clearly established federal law, as

determined by the United States Supreme Court or was it based on an unreasonable determination

of the facts in light of the evidence presented.  As with the victim impact testimony claim, it appears

from the headings that this claim was intended to be one of prosecutorial misconduct. Again, it is unclear. Given that the claim, as drafted, make no specific legal argument, cites no case law, and merely argues that Petitioner was denied his "right to a fair trial," the Court finds no legal basis for such a claim. Likewise, assuming that this claim was intended to be one of trial court error, the Court finds no legal basis for it and finds that the Florida courts reasonably applied clearly established federal law. *See Huddleston v. United States*, 485 U.S. 681 (1988). This claim is rejected.

### B. Ineffective Assistance of Counsel

Petitioner also asserts that his trial counsel was ineffective for failing to object to "many of the comments" made by the State during closing argument and appellate counsel was ineffective for failing to challenge the conduct as fundamental error on appeal. ([D.E. 32] at 100). Petitioner asserted similar claims in both his appeal from the denial of his postconviction Rule 3.850 motion and his state petition for writ of habeas corpus. (*See* [D.E. 16-5] at 62-64; [D.E. 16-8] at 41). Both claims were denied because they were "refuted by the record" or "without merit" or "would have been rejected on direct appeal." *Rodriguez*, 39 So.3d at 284, n.8, 295 (Fla. 2010). As to his ineffective assistance of trial counsel claim, it is insufficiently plead. Petitioner seemingly argues that his counsel was ineffective in failing to object to "many of the comments." Petitioner does not specify which comments. Apparently, he has left it for the Court to speculate as to which comments his counsel should have voiced an objection. The Court declines to so speculate, noting that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20 (9th Cir. 1994).

### C. Ineffective Assistance of Appellate Counsel

Nonetheless, in an abundance of caution, the Court has reviewed the State's closing argument. The Court finds Petitioner's argument lacks merit. Defense counsel objected to the State's closing argument on at least twelve separate occasions, including during some of the arguments complained of here. ([D.E. 16-65] at 19, 37). The majority of those objections were sustained. Further, Petitioner mis-characterizes certain of the arguments made by the prosecutor. Petitioner asserts that the prosecutor "compared Manuel Rodriguez to the serial killer and torturer portrayed in the movie 'Silence of the Lambs.'"[19] ([D.E. 32] at 100). The record does not support this assertion. Rather, the prosecutor used an analogy of the investigative clues in the movie to argue that Petitioner had the time and opportunity to plan these murders because he lived in Miami, knew the victim and had the ability to "covet the items" taken during the robbery. The prosecutor pointed out that, unlike Luis Rodriguez who lived in Orlando at the time, Petitioner had been inside the victim's home and had seen the items that were taken during the murders. ([D.E. 16-65] at 36-39). To make this point, the prosecutor quoted from the film where the FBI agent asks the criminal if people seek out the things they covet and his response was that "we covet the things we see every day." (*Id.* at 38). The prosecutor used this quote to argue to the jury that Petitioner, not Luis Rodriguez, was the mastermind behind the crimes. The State did not, as Petitioner asserts, compare him to the character in the movie.

Here, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial

---

[19] While the Court observes that the State's comments during closing may have been unnecessary and potentially inflammatory for the point that the State was attempting to convey to the jury, it is not accurate to represent that the State compared Petitioner to a serial killer and torturer. Additionally, defense counsel objected not once but twice to the use of this analogy. Those objections were overruled. ([D.E. 16-65] at 37).

with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). They did not. "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id*. at 181. Here, the Court finds that even if the prosecutor made certain improper comments, they did not so infect Petitioner's trial with unfairness such that he was denied due process. Accordingly, the Court finds that appellate counsel was not ineffective for failing to argue this claim on direct appeal. This claim must also be rejected.

### V. Whether Petitioner was denied a reliable sentencing phase due to the individual and cumulative effects of Brady violations, ineffective assistance of counsel and trial error.

During the penalty phase, Petitioner called several mental health experts and certain family members to testify during the penalty phase. In rebuttal, the State presented the testimony of mental health experts and a police detective. The police detective testified as to certain statements made to him by Petitioner's cellmate, Alejandro Lago.[20] These statements are the subject of this claim.

#### A. Brady Violation[21]

Petitioner contends that the State improperly withheld information regarding Lago in violation of *Brady*. ([D.E. 32] at 109-113). Specifically, Petitioner argues that there were certain letters sent by police detectives to various law enforcement agencies outlining Lago's cooperation. Additionally, Mr. Lago had taken a polygraph which was not disclosed to Petitioner. (*See* [D.E. 32]

---

[20] The Florida Supreme Court held this constituted error, but was harmless. *Rodriguez*, 753 So.2d at 44-45.

[21] This claim is quite obviously a *Brady* claim despite the fact that Petitioner does not 1) cite to *Brady*, 2) argue the three elements required to be met in order to establish a *Brady* violation or 3) reference the Florida Supreme Court's opinion on this claim.

at 110).  Mr. Lago did not testify at trial.  Rather, his testimony was admitted through a third party

testifying as to what he said.  Petitioner argued trial court error on direct appeal.  The Florida

Supreme Court agreed, but found it harmless error.  Now, Petitioner argues that had he known about

the letters and the polygraph, his counsel would have investigated these matters further because this

information could have been used as impeachment.  Petitioner first raised this claim on appeal from

the denial of his Rule 3.850 postconviction motion.  ([D.E. 16-5] at 86).

The Florida Supreme Court affirmed the trial court's denial of relief.

> We affirm the trial court's conclusion.  As addressed above, in order to prevail on a
> *Brady* claim, Rodriguez must show: "(1) that favorable evidence-either exculpatory
> or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3)
> because the evidence was material, the defendant was prejudiced." *Riechmann*, 966
> So.2d at 307.  Here, there are substantial questions as to whether Lago had been
> promised any benefits for his assistance before the trial and whether the polygraph
> would have led to any favorable evidence.  Even if Rodriguez could meet the first
> prong of *Brady*, however, he cannot show prejudice.  On direct appeal, this Court held
> the trial court erred in permitting Lago's statements to be admitted through Detective
> Crawford.  However, the Court explicitly determined that "the admission of the
> testimony was harmless beyond a reasonable doubt given the number of strong
> aggravators in this case and the conflicting testimony as to Manuel Rodriguez's
> mental health, including some testimony that he was a malingerer." *Rodriguez*, 753
> So.2d at 45.  Turning to the *Brady* claim, the challenged documents would only have
> presented potential additional bases to impeach Lago's statements, assuming they
> were admissible at all.  This additional evidence would not change our harmless error
> analysis as set forth on direct appeal.  Accordingly, we affirm the postconviction
> court's ruling on this claim.

*Rodriguez*, 39 So.3d at 294-95.  The Court agrees.  "Three elements establish a Brady violation: (1)

the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2)

the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the

evidence must be material so as to establish prejudice." *Stephens v. Hall*, 407 F.3d 1195, 1203 (11th

Cir.2005).  The prejudice or materiality requirement is satisfied if "there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Here, the Florida Supreme Court properly analyzed clearly established federal law and made a reasonable application of that law to the facts.  The Court continues to agree that Detective Smith should not have been allowed to testify as to statements made by Mr. Lago.  Indeed, the non-disclosure of these statement and the polygraph may constitute the withholding of evidence which may have been favorable to the defense. However, the Court finds that given the aggravators present and the fact that there was already disagreements among the mental health experts (not the hearsay statements of Mr. Lago) regarding malingering, Petitioner has not shown that he was prejudiced sufficient to met the third prong of *Brady*.

On the final page of his argument, Petitioner makes a cumulative effect argument.  However, as addressed below, since the Court has found no singular error, Petitioner's cumulative effects claim must be denied. As the Court has found no errors, there can be no cumulative error.  *See United States v. Waldon*, 363 F.3d 1103 (11th Cir. 2004)(citing *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001)("If there are no errors or a single error, there can be no cumulative error")).  This claim is rejected.

### B. Ineffective Assistance of Trial Counsel

Petitioner asserts that his counsel was ineffective during the sentencing phase because he failed to present sufficient evidence of the existence a mental disorder which could have rebutted the aggravating circumstances presented to the jury.  ([D.E. 32] at 113-14).  Petitioner first argued this claim on appeal of the denial of his Rule 3.850 postconviction motion.  ([D.E. 16-5] at 81).  The Florida Supreme Court summarily denied this claim because it was either "refuted by the record" or "without merit."  *Rodriguez*, 39 So.2d at 284, n.8.   Again, the Court finds itself reviewing a claim

that is insufficiently plead.  While apparently a claim for ineffective assistance of counsel, this claim fails to apply the two prong test of *Strickland,* and most particularly, to explain how Petitioner was prejudiced.  The Court gleans that Petitioner is attempting to argue that his counsel could have established that Petitioner did not have the requisite mental state to qualify for the CCP aggravating circumstance but failed to do so.  This contention is speculative at best.  There is nothing in the record to suggest that this could have been proven conclusively and, more importantly, that Petitioner was prejudiced.  A court may decline to reach the performance prong of the standard if it is convinced that the prejudice prong cannot be satisfied.  *Strickland,* 466 U.S. at 697; *Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir. 1995).  Here, there simply is no indication that trial counsel's failure to put forth mental health evidence sufficient to rebut the aggravating circumstances rendered Petitioner's trial "fundamentally unfair" or that "there is a reasonable probability that, but for counsel's unprofessional errors that the result of the proceeding would have been different." *Devier*, 3 F.3d at 1451*; Strickland*, 466 U.S. at 694.

## C. Trial Court Error

Petitioner argues that the trial court erred when it improperly found and applied certain aggravators in sentencing Petitioner to death.  ([D.E. 32] at 114-16).  Petitioner first argued this claim on direct appeal of his conviction and sentence.  ([D.E. 16-1] at 97).  The Florida Supreme Court carefully examined the sentencing order issued by the trial judge and found as follows:

> In his seventh claim, Rodriguez claims that the trial court improperly considered as separate aggravating circumstances that the murder was committed during an armed burglary and was committed for pecuniary gain. We agree. We have previously determined that when two aggravating circumstances refer to the same aspect of a crime the two aggravators cannot be considered separately. We found in *Cherry v. State*, 544 So.2d 184, 187 (Fla.1989), that when someone commits a murder after breaking into a home with the intent to steal something, the aggravating factors that the murder was committed for pecuniary gain and committed during the course of a

60

burglary should be considered as one aggravating circumstance. As in *Cherry*, the purpose of the burglary in this case was to rob the Josephs. Accordingly, we conclude that the trial judge erroneously considered these two aggravators separately. Nevertheless, given the five remaining valid aggravating circumstances, we find this error to be harmless beyond a reasonable doubt.

Next, Rodriguez argues that the trial court erred in finding the murders to be CCP. He contends instead that the murders were committed during the course of a heated argument and that the trial court improperly considered a prior inconsistent statement as substantive evidence in reaching its conclusion as to this aggravating circumstance. We disagree.

To establish CCP, the State must show that the murder was (1) the product of a careful plan or prearranged design; (2) the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (3) the result of heightened premeditation; and (4) committed with no pretense of moral or legal justification. *Jackson v. State*, 704 So.2d 500, 504 (Fla.1997). Here, the court found CCP based on the following facts: Manuel Rodriguez called Luis Rodriguez to elicit his assistance in the crime; Manuel planned a ruse to enter the apartment but formulated a back-up plan to force his way into the apartment if that plan failed; Manuel armed himself with a loaded handgun and two pairs of latex gloves so as not to leave any fingerprints in the apartment if the initial plan did not work; Manuel fired an additional shot into each victim from close range to make sure they were dead; none of the elderly victims offered any resistance; each victim was shot while seated and fully compliant; and Manuel told Malakoff that he made certain that the victims were dead.

*Rodriguez*, 753 So.2d at 46-47. The Florida sentencing statute has been upheld as constitutional. Its application is a matter of state law. *See Lewis v. Jeffers*, 497 U.S. 764 (1990). Assuming that the trial court erred in finding that one or more aggravating circumstances applied, in order to be entitled to habeas relief, Petitioner must show that "the trial judge's consideration of this improper aggravating circumstance so infects the balancing process created by the Florida statute that it is constitutionally impermissible for the Florida Supreme Court to let the sentence stand." *Barclay v. Florida,* 463 U.S. 939 (1983). "The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" 28 U.S.C. § 2254(a). And we have repeatedly

held that " 'federal habeas corpus relief does not lie for errors of state law.' " *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." 502 U.S., at 67-68, 112 S.Ct. 475. *Wilson v. Corcoran*, 131 S.Ct. 13 (2010). The trial court found six aggravating circumstances. The Florida Supreme Court found one duplicative. There were five remaining.  Even if the CCP aggravator was wrongly applied, which does not appear to be the case, that leaves four aggravating circumstances to support the trial court's sentence.   Here, the Court finds that it is not constitutionally impermissible to allow Petitioner's sentence determination to stand. This claim is rejected.

### VI. Whether Petitioner was deprived of his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments during the penalty phase of trial due to appellate counsel's failures.

Petitioner contends that his appellate counsel failed to raise certain trial court errors made during the penalty phase in his direct appeal of his conviction and sentence. ([D.E. 32] at 117-26). Petitioner raised this claim in his state petition for writ of habeas corpus. ([D.E. 16-8] at 16-25).  The Florida Supreme Court denied this claim as it "would have been rejected on direct appeal." *Rodriguez*, 39 So.3d at 295.

### A. Ineffective Assistance of Appellate Counsel

In particular*,* Petitioner argues that his appellate counsel was ineffective for failing to argue on direct appeal: 1) that the trial court erred by restricting the presentation of mitigation evidence, 2) that the trial court erred by failing to properly consider mitigation, 3) prosecutorial misconduct and 4) cumulative effect of error.  The basis of this claim centers around lay witnesses and the mental health testimony put on by Petitioner during the penalty phase.

### i. Restriction on Mitigation

It was Petitioner's strategy at sentencing to put forth a multi-generational mental illness argument.  At the hearing, two of Petitioner's sisters testified. They testified at length regarding Petitioner's mother's mental state over the course of 30 years.  They testified regarding their mother's suicide attempts and her medications.  However, when his sisters attempted to testify about their own children's mental health issues, the trial court sustained the objections on relevancy grounds.  (*See* [D.E. 16-70]).  The trial judge's primary reason for excluding that testimony was that Petitioner had been diagnosed with schizophrenia induced by substance abuse and no medical expert testified that this mental disorder was hereditary, or that there was a link to his niece's mental illness. (*See* [D.E. 16-71] at 9-18).

In *Tennard*, the United States Supreme Court articulated the well-established standard for relevancy applicable to mitigating evidence in capital cases.  *Tennard*, 542 U.S. at 285 ("any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").  Under this standard, it appears that the objection was properly sustained. However, even if the Court were to agree that the trial court erred in not allowing Petitioner's sisters to testify regarding the mental health of Petitioner's niece, the claim still fails.  Petitioner is unable to show the prejudice required.  In *Sears v. Upton*, 130 S.Ct. 3259 (2010), the United States Supreme Court reiterated the proper application of the prejudice standard in the context of a penalty phase mitigation investigation. "To assess [the] probability [of a different out-come under *Strickland*], we consider the totality of the available evidence - both adduced at trial, and the evidence adduced in the habeas proceeding - and reweig[h] it against the evidence in aggravation."  *Sears*, 130 S.Ct. at 3267 (citing *Porter v. Collum*, 130 S.Ct.

63

447, 453-54 (2009)).  The trial court gave great weight to all the aggravating factors found by the court, including "very great weight" to the prior violent felony convictions while giving only "some weight" to the mental illness mitigator.  (*See* [D.E. 16-76]).  Given that the trial court found that Petitioner met the statutory definition for numerous aggravators[22], including seventy-one (71) prior violent felonies, and weighed those aggravators against the non-statutory mitigator that Petitioner was and is mentally ill at sentencing and that his niece suffered a similar mental illness, it is not probable that the sentencing result would have been different had the trial court admitted the evidence. This claim is rejected.

### ii. Failure to Properly Consider Mitigation

Petitioner argues that the trial court "refused to consider the evidence of Manuel Rodriguez's mother's mental illness, based on a faulty assumption that 'I don't think depression has ever been identified as a major mental illness." ([D.E. 32] at 121).  Petitioner's claim is that his appellate counsel was ineffective for failing to raise this claim on direct appeal.    While Petitioner acknowledged that the trial court instructed the jury that one of the nonstatutory mitigators to consider is "that the defendant's mother has a history of mental problems which has impacted upon the Defendant," he still argues that the trial court failed to "properly assess the mitigating circumstances."  ([D.E. 32] at 121).  The entire factual basis for this claim is based on an alleged statement by the trial court that she did not think that "depression has ever been identified as a major

---

[22] The trial court found that Petitioner met the statutory definition for six aggravators. However, the Florida Supreme Court found it was improper to consider as separate aggravating circumstances that the murder was committed during an armed burglary and was committed for pecuniary gain. *Rodriguez*, 753 So.2d at 46.

mental illness."[23]   Petitioner's claim fails as he provides absolutely no record support for this contention.   There is no showing that appellate counsel's performance was not deficient in this respect.   This claim is rejected.

### iii. Prosecutorial Misconduct

Petitioner also asserts prosecutorial misconduct during closing argument when the State "turned the mitigation provision on its head, arguing it as aggravation." ([D.E. 32] at 122). Petitioner's criticizing of the State's closing argument lacks merit.  During his closing, Petitioner first argued that he should be spared the death penalty based on his mental illness.  The State, in response, argued differently.   Not surprisingly, Petitioner has failed to cite any case for the proposition that a prosecutor may not rebut the defendant's mitigation argument that he has a mental disease or defect, particularly, when there was expert testimony that the defendant may be malingering.  (*See* [D.E. 16-72, 73]).

Petitioner's second argument is that the prosecutor improperly "focused on the evidence of prior felony conviction[s] to the point that they became of [sic] feature of the penalty phase, in violation of Florida law." ([D.E. 32] at 123).  In support of this argument, Petitioner cites two Florida cases. *See Finney v. State*, 660 So.2d 674 (Fla. 1995); *see also Duncan v. State*, 619 So.2d 279 (Fla.

---

[23] Petitioner cites to page 3475 of the transcript for this quotation.  The Court did not find this statement there (page 3475 is where the judge charged the jury during the guilt phase). Rather, the Court found this statement being made as part of an evidentiary ruling on whether or not Petitioner's sister could testify about her nine year old daughter's mental health.  (*See* [D.E. 16-71] at 13).  The exact quote is "Not through heredity - - and if I missed something I am sure that you will bring it to my attention - - depression, and that is what I would like to check.  I am - - I don't think depression has ever been identified as a major mental illness, and depression is I believe something that can happen either - - I don't know if it's hereditary or not hereditary, but we have not had any doctor that testified that depression is hereditary." (*Id.*)  The trial judge then reviewed the expert testimony and found that Petitioner was not diagnosed as having major depression.  Petitioner was diagnosed as being schizophrenic. (*Id.* at 3914).

1993).  Neither *Finney* nor *Duncan* support Petitioner's argument.   Regardless, Petitioner argues that the State's argument violated Florida law.[24]  Even if so, this claim is not cognizable in a federal habeas court.  "A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir.1992). This claim is rejected.[25]

### iv. Cumulative Effect

The remaining claim appears to be one of ineffective assistance of appellate counsel based on the cumulative effect of failure to assert trial court errors on direct appeal. ([D.E. 32] at 126). However, as the Court has found no singular error, Petitioner's cumulative effects claim must be denied.  *See United States v. Waldon*, 363 F.3d 1103 (11th Cir. 2004)(citing *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001)("If there are no errors or a single error, there can be no cumulative error")). When the Court engaged in a sub-claim by sub-claim analysis and has found each to be without merit, unless the trial was rendered fundamentally unfair, there is no cumulative error.  *See Cargill v. Turpin*, 120 F.3d 1366, 1386-87 (11th Cir. 1997).   The Florida Supreme Court has

---

[24] Nonetheless, the Court reviewed the transcript of the State's closing argument and does not find that the prosecution made Petitioner's collateral convictions a "feature of the penalty phase."  Even if this claim was cognizable here, it would be found to be without merit.

[25] The remaining paragraph of this sub-section is unclear. ([D.E. 32] at 124). After having spent three paragraphs arguing prosecutorial misconduct, Petitioner then argues that his Eighth Amendment rights were violated because of the "sentencer's consideration of improper and unconstitutional non-statutory aggravating factors." (*Id.*)  Petitioner fails to articulate which "non-statutory aggravating factors" were considered by the trial court. His concluding sentence argues that the state court's reliance on evidence that he was a malingerer in conducting the harmless error analysis and admitting hearsay testimony of a jail house snitch "highlights the prejudice that resulted from appellate counsel's failure to raise this issue on direct appeal."  (*Id.*). It is not clear what claim Petitioner is attempting to assert. And, of course, there is no analysis to show that the claim is viable. Therefore, it is rejected as insufficient.

determined and, for the reason previously articulated in this Order, the Court agrees, Petitioner's trial was not rendered fundamentally unfair.  This claim is rejected.

### VII. Whether Petitioner's convictions and sentences were obtained in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments because his trial counsel labored under a conflict of interest.

Petitioner asserts this claim of ineffective assistance of counsel based on a conflict of interest. ([D.E. 32] at 117). The core of this claim is that his attorney was married to an assistant public defender whose office represented Luis Rodriguez.  Petitioner argues that this resulted in a conflict of interest which may have caused his trial counsel to not pursue cross-examination and impeachment effectively because it could have caused the plea deal that his counsel's wife's office negotiated for Luis Rodriguez to "fall through." (*See* [D.E. 32] at 132).  Petitioner first argues this claim on appeal of the denial of his Rule 3.850 postconviction motion.  ([D.E. 16-5] at 83).  The Florida Supreme Court summarily denied this claim because it was either "refuted by the record" or 'without merit." *Rodriguez*, 39 So.2d at 284, n.8.

"[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). At trial, Petitioner was represented by two attorneys.  Mr. Houlihan and Mr. Zenobi.  Mr. Houlihan was lead counsel during the guilt phase and Mr. Zenobi was lead counsel during the sentencing phase. It was only after Petitioner was found guilty that he raised any concern of a conflict of interest by Mr. Houlihan.  However, when the trial court inquired of the Petitioner as to Mr. Zenobi's representation during the penalty phase Petitioner responded that he was "quite comfortable with Mr. Zenobi right now" and had no problem with Mr. Zenobi representing him during the sentencing phase. ([D.E. 16-67] at 3519).  As Petitioner did not timely raise this argument during trial, he must

show an actual conflict of interest. He has not done so.

Petitioner's claim is that a conflict of interest exists because Mr. Houlihan's wife works for the Miami-Dade Public Defender's Office which represented Luis Rodriguez. This does not, in and of itself, create an actual conflict of interest. However, Petitioner argues that Mr. Houlihan "failed to vigorously and adequately cross-examine" Luis Rodriguez. ([D.E. 32] at 131). Petitioner attempts to argue this point by way of example. "For example, the record shows that Houlihan knew that Luis's wife had testified in deposition that she and her husband had sexual relations with approval from law enforcement" and Mr. Houlihan "had access to the report for the aggravated battery conviction, but never confronted Luis." This contention is refuted by the record.

On cross-examination, Mr. Houlihan asked Luis Rodriguez, "[n]ow, one of the officers told you or her to put a napkin - - or napkin or pieces of paper over the peep hole?" ([16-60] at 82). Luis Rodriguez denied that anyone told him to do that. (*See* [D.E. 16-60] at 83). Mr. Houlihan then inquired if he had ever read his wife's deposition, he testified that he did not. (*Id.*). There is certainly no basis for Petitioner's contention that Mr. Houlihan failed to cross-examine Luis Rodriguez on this point. Mr. Houlihan asked the questions. Luis Rodriguez denied that the police knew what he and his wife were doing. Luis Rodriguez also testified that he had not read his wife's deposition. Petitioner may not like the answers he received but Mr. Houlihan asked the questions.

Further, Petitioner's allegations that his counsel did not adequately question Luis Rodriguez about his aggravated battery conviction are simply wrong. Mr. Houlihan specifically inquired of Luis Rodriguez about the aggravated battery on a law enforcement officer. ([D.E. 16-61] at 21-24). Indeed, the questioning spanned over four pages of the trial transcript. The Court finds that this claim is without merit, refuted by the record and that the Florida Supreme Court properly denied this

claim without hearing.  This claim is rejected.

### VIII. Whether Petitioner was denied his due process rights and is entitled to an evidentiary hearing.

Petitioner argues that he is entitled to an evidentiary hearing on his claims in federal court because the state courts only held "limited and truncated" hearings where improper restrictions were placed on the presentation of evidence. ([D.E. 32] at 136).  Petitioner also  contends that the trial court made erroneous factual findings upon which the Florida Supreme Court relied. (*Id.* at 139). Petitioner also argues that the trial court improperly denied discovery requests.  (*Id.* at 140).  Finally, Petitioner asserts that he is entitled to an evidentiary hearing because the trial judge should have disqualified herself during the postconviction proceedings.  (*Id.* at 143).

Petitioner contends that he is entitled to a hearing on all the claims in his Petition because, even on the claims for which he was granted a evidentiary hearing, the state court judge made improper evidentiary rulings, improperly denied discovery requests and was biased against Petitioner.   Petitioner, by in large, attempts to show these errors and bias by "way of example" and without appropriate record support.  The Court cannot reasonably analyze these claims by "way of example" as Petitioner suggests.   If Petitioner believes that trial court erred, he should cite specifically to the record which purportedly supports his claim.  Further, he fails to cite to the opinion of the Florida Supreme Court on this claim and demonstrate why its decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner has not done so.  To the extent that Petitioner is arguing that the trial court's purported errors, omissions, or bias constitutes a viable claim which can be remedied by the Court, he has failed to demonstrate a claim upon which habeas relief can be granted.  The

Eleventh Circuit has repeatedly held that claims similar to Petitioner's are not cognizable for federal habeas review.

> This Court has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief. *See, e.g., Anderson v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006) (per curiam); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir.1987) (per curiam). The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment- i.e., the conviction itself-and thus habeas relief is not an appropriate remedy. *See Quince*, 360 F.3d at 1261-62; *Spradley*, 825 F.2d at 1568. Moreover, such challenges often involve claims under state law-for example, Florida Rules of Criminal Procedure 3.850 and 3.851, which govern the availability of, and procedures attendant to, post-conviction proceedings in Florida-and "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *See McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992).

*Carroll v. Sec'y, Dep't. of Corr.*, 574 F.3d 1354, 1365 (11th Cir. 2009)(allegation that trial court violated defendant's due process rights when it declined to grant him an evidentiary hearing did not state a cognizable claim for federal habeas relief). As *Carroll* dictates, Petitioner's claim is not one for which federal habeas relief is available. 574 F.3d at 1365. Indeed, the Eleventh Circuit has stated that "it is 'beyond debate' that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief." *Id.* (quoting *Anderson*, 462 F.3d at 1330). Therefore, because Petitioner's due process claim rests on the state court's failure to grant an evidentiary hearing under Florida law, it is rejected.

Alternatively, Petitioner appears to argue that he is entitled to an evidentiary hearing in federal court on all the claims asserted in the instant Petition, including claims already presented at the 2004 and 2008 evidentiary hearings in state court. He asserts that this is so because he was not granted a fair and full evidentiary hearing by the state court due to its alleged errors, omissions and

bias.[26] ([D.E. 36] at 46-47).  Petitioner argues that he is entitled to a re-hearing on claims previously

presented and a plenary hearing on claims that were denied without hearing.  The Court disagrees.

---

[26]  Petitioner failed to assist the Court by delineating which claims were the subject of prior state court proceedings and which would need plenary review should the Court determine that Petitioner would be entitled to an evidentiary hearing.  As the Petition is not a model of clarity, the task of discerning which claims fall into which category was not an easy one. It is further complicated by an almost complete failure to cite to the record below. This task undertaken by the Court was unduly and unnecessarily burdensome.  However, the Florida Supreme Court's summary was instructive:

> [T]he trial court agreed to hold a hearing on the following claims: (1) trial counsel rendered ineffective assistance in failing to present evidence that Luis and Isidoro left Orlando together to commit the crimes; (2) trial counsel rendered ineffective assistance in failing to present testimony of Edgar Baez, an eyewitness, to describe the man he saw pull or take a woman into the apartment at the time of the crimes; (3) trial counsel rendered ineffective assistance in failing to present evidence that Luis, Raphael Lopez, and other members of Luis's family possessed jewelry taken from the victims; (4) the State knowingly presented false evidence and did not disclose details of family visits that were allowed to Luis while he was in jail and that police knew about, and possibly encouraged, Luis's engagement in sexual relations with his wife in the police station in order to obtain his favorable testimony; (5) the State knowingly presented false evidence that it had not promised to assist Luis in obtaining parole in exchange for his testimony; and (6) the State knowingly presented false evidence that it did not threaten Luis into confessing by showing him fake indictments against his family.

*Rodriguez v. State*, 39 So.3d 275, 283 (Fla. 2010).  After the trial court's denial of relief, the

Florida Supreme Court:

> affirmed the circuit court's ruling that denied Rodriguez's motions to disqualify the postconviction trial judge, but relinquished jurisdiction to the circuit court for further evidentiary proceedings on the following claims: (1) the State's failure to disclose two letters that Willy Sirvas wrote to the prosecutor before the trial, alleging that he knew Luis would lie; (2) the State's failure to disclose letters pertaining to potential impeachment of Alejandro Lago, a witness whose hearsay statements were heard by the jury in the penalty phase through Detective Crawford; and (3) various potential impeachment evidence relating to Isidoro.

*Id.* at 283. The remaining claims were denied without hearing.

71

> The "decision to grant an evidentiary hearing [is] generally left to the sound discretion of district courts." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *see* 28 U.S.C. § 2254, R. 8(a) ("[T]he judge must review the answer [and] any transcripts and records of state-court proceedings ... to determine whether an evidentiary hearing is warranted."). A district court should hold a hearing if there are disputed facts concerning the petitioner's habeas claim, and the petitioner did not receive a full and fair state court hearing, either at trial or in a collateral proceeding. *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), overruled in part on other grounds by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), *superceded* by 28 U.S.C. § 2254(e)(2); *see also Schriro*, 550 U.S. at 473, 127 S.Ct. 1933. In other words, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. at 474, 127 S.Ct. 1933. "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id*. The petitioner is not entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

*Boyd v. Allen*, 592 F.3d 1274, 1304-05 (11th Cir. 2010). The Court has reviewed the state court record and finds that as to his claims in which evidence was already presented to the state courts, Petitioner received a full and fair hearing.[27] At the 2004 hearing, Petitioner presented testimony of "Edgar Baez, trial prosecutor Abraham Laeser, Rodriguez's trial counsel Richard Houlihan and Eugene Zenobi, Luis's trial counsel Art Koch, and Luis [Rodriguez]." *Rodriguez*, 39 So.3d at 283. At the 2008 hearing, Petitioner "presented the testimony of Willy Sirvas (concerning potential impeachment evidence regarding Luis), Sergeant Kenneth Alan Singleton (concerning potential impeachment evidence regarding Isidoro), Detective John LeClaire (concerning potential impeachment evidence regarding Isidoro), Lieutenant Daniel Villanueva (concerning potential impeachment evidence regarding Isidoro), Diane Pattavina (concerning whether there were secret

---

[27]Besides the two hearings held at the trial court, the Florida Supreme Court also held oral argument on two separate occasions before ultimately denying postconviction relief.

dockets pertaining to Isidoro), Jose Arrojo (concerning whether there were secret dockets pertaining to Isidoro), and Detective Greg Smith (concerning Lago), as well as Abraham Laeser, Richard Houlihan, and Eugene Zenobi." *Id.* at 283-84.  The deficiencies of which Petitioner complains either fall into the category of those about which the Court may not second guess the state courts, including state court evidentiary rulings and denials of discovery requests, claims of errors in factual findings or of judicial bias which are not supported by the record.  The Court finds that Petitioner was given a full, fair and adequate evidentiary hearings.  In summary, Petitioner has not shown that he was in any meaningful way prevented from presenting relevant evidence in accordance with Florida law.[28] *See William v. Allen*, 542 F.3d 1326 (11th Cir. 2008).  Accordingly, the State court's factual findings are presumed correct and federal evidentiary hearing is not required.

As to the claims for which no state court hearing was held, the Court finds that a hearing would not enable Petitioner to prove factual allegations, which, if true, would entitle him to federal habeas relief.  The Court finds that a hearing would not assist in the resolution of his claims because they are without merit or specifically refuted by the record.  Petitioner's request for an evidentiary hearing is denied.

---

[28]  Regarding the trial judge's alleged bias against Petitioner's postconviction counsel, the Court agrees that the trial court's *ex parte* meeting with the court reporter to "correct" the transcript was not the norm.  This was further compounded by the fact that the trial judge did not disclose this meeting to the parties until after the court reporter informed defense counsel of the meeting.  Nonetheless, the Court does not find that this resulted in a denial of a fair evidentiary hearing. The errors corrected in the transcription were done after the evidentiary hearing and there is nothing in the record to suggest that these "corrections" changed the course of the hearing or the evidence presented.  Indeed, the trial court issued its order denying the postconviction motion based "on the Court's notes and attending the hearing."  ([D.E. 16-92] at 55).  The postconviction order issued on the same day the court denied the motion to disqualify the judge.  (*Id.*).  Clearly, the order on Petitioner's Rule 3.850 motion had been prepared in advance of the motion to disqualify the judge.  The alleged animus between the trial judge and postconviction counsel appeared to occur at the time of the filing of the motion to disqualify.

### IX. *Whether Petitioner is competent to proceed.*

Petitioner asserts that he "has long suffered from major mental illness and drug addiction and as a result, has been in and out of jails, prisons, and mental institutions his entire adult life." ([D.E. 32] at 146). He argues that he has the right to be competent during the litigation of his federal habeas petition. The State responds that this is not a cognizable claim. ([D.E. 34] at 493). Petitioner concedes that his "mental status appears to be stable at this time." ([D.E. 32] at 147). Nonetheless, Petitioner makes this claim "in an abundance of caution in order to preserve his rights should his mental status decompensate once again during the course of collateral proceedings." (*Id.*).

On August 3, 2010, Petitioner filed a motion for competency evaluation, competency hearing, and for a stay of proceedings pending competency determination. ([D.E. 9]). The Court granted the motion, stayed the proceedings, and issued an order for a competency evaluation and hearing. ([D.E. 17]). However, the very next day, Petitioner filed a motion to vacate because "counsel no longer ha[d] a good faith basis to pursue a determination of competency." ([D.E. 18]). Counsel advised the Court that she had a legal visit with Petitioner and "[i]t was clear that the Petitioner had read the Petition for Writ of Habeas Corpus that had been filed on his behalf; he was able to rationally communicate his desire to add some factual issues and claims." ([D.E. 18] at 2). After hearing, the Court granted the motion to vacate and allowed Petitioner to amend his pleadings. ([D.E. 26]). Petitioner did so. (*See* [D.E. 32]). The amended petition before the Court was filed with Petitioner's input, at a time when he had advised the Court he was competent to proceed. This claim is rejected.

### VII.   CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Manuel Rodriguez's Amended Petition for Writ of

Habeas Corpus by a Person in State Custody [D.E. 32] is DENIED.  The Clerk of the Court is instructed to CLOSE the case.

      DONE in Chambers, Miami, Florida, on May 11, 2011.

<br/>

PAUL C. HUCK
UNITED STATES DISTRICT JUDGE

cc: counsel of record